# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-1586

_____

| | | |
|---|---|---|
| Herman Schumacher; Michael P. Callicrate; Roger D. Koch, | * * * | |
| Plaintiff/Appellees, | * * | |
| v. | * * * | Appeals from the United States District Court for the District of South Dakota. |
| Cargill Meat Solutions Corp., doing business as Excel Corporation, | * * * | |
| Defendant/Appellant. | * * | |
| Swift Beef Company, formerly known as ConAgra Beef Company; National Beef Packing Company; Tyson Fresh Meats, Inc., | * * * * * | |
| Defendants. | * | |

_____

No. 07-1588

_____

| | | |
|---|---|---|
| Herman Schumacher; Michael P. Callicrate; Roger D. Koch, | * * * | |
| Plaintiff/Appellees, | * * | |
| v. | * * | |
| Cargill Meat Solutions Corp., doing business as Excel Corporation, | * * | |

|  |  |
|---|---|
|  | * |
| Defendant, | * |
|  | * |
| Swift Beef Company, former known as ConAgra Beef Company, | * |
|  | * |
|  | * |
| Defendant/Appellant, | * |
|  | * |
| National Beef Packing Company; Tyson Fresh Meats, Inc., | * |
|  | * |
|  | * |
| Defendants. | * |

_____

No. 07-1590

_____

|  |  |
|---|---|
| Herman Schumacher; Michael P. Callicrate; Roger D. Koch, | * |
|  | * |
|  | * |
| Plaintiff/Appellees, | * |
|  | * |
| v. | * |
|  | * |
| Cargill Meat Solutions Corp., doing business as Excel Corporation; Swift Beef Company, formerly known as ConAgra Beef Company; National Beef Packing Company, | * |
|  | * |
|  | * |
|  | * |
|  | * |
|  | * |
| Defendants, | * |
|  | * |
| Tyson Fresh Meats, Inc., | * |
|  | * |
| Defendant/Appellant. | * |

_____

Submitted: November 14, 2007
Filed: January 29, 2008
_____

Before MELLOY, BEAM, and SHEPHERD, Circuit Judges.
_____

BEAM, Circuit Judge.

Cargill Meat Solutions Corporation, Swift Beef Company, and Tyson Fresh Meats, Inc. (collectively the "Packers") appeal the district court's judgment entered after a jury trial in a class action brought under the Packers and Stockyards Act (PSA). The Packers argue, inter alia, that the district court improperly instructed the jury that the Packers could be liable for violating § 202(e) of the PSA even if they acted unintentionally.[1] Because we hold that a showing of intent is required under § 202(e), we reverse the district court's judgment.

## I.    BACKGROUND

Plaintiffs, a class comprised of live cattle sellers, filed suit under the PSA against four packers–Cargill, Swift, Tyson,[2] and Farmland National Beef Packing Company, L.P.[3] The plaintiffs' beef: the packers violated § 202(a) and (e) of the PSA by taking advantage of the United States Department of Agriculture's (USDA) error in calculating cutout values, which error lowered the prices the packers paid the plaintiffs for their cattle.

---

[1]Because we decide this appeal on the Packers' improper-jury-instruction argument, we need not address the Packers' other claims.

[2]In 2004, the district court granted a motion to substitute Tyson for IBP, Inc.

[3]Farmland National Beef Packing Company, L.P. prevailed at trial and is not a party to these appeals.

The Livestock Mandatory Reporting Act (LMRA) controls the USDA's reporting of cutout values.  Pursuant to the LMRA, packers[4] are required to report to the Secretary of the USDA, at least twice a day, information on most boxed beef sales,[5] including the price received for each negotiated boxed beef transaction. 7 U.S.C. § 1635f(a).  Once the USDA receives this information, it must make it available to the public.  Id. § 1635f(b).

---

[4]The LMRA only requires certain packers to report to the USDA.  Those packers that must report are those who are:

> engaged in the business of buying cattle in commerce for purposes of slaughter, of manufacturing or preparing meats or meat food products from cattle for sale or shipment in commerce, or of marketing meats or meat food products from cattle in an unmanufactured form acting as a wholesale broker, dealer, or distributor in commerce, except that- (A) the term includes only a cattle processing plant that is federally inspected; (B) for any calendar year, the term includes only a cattle processing plant that slaughtered an average of at least 125,000 head of cattle per year during the immediately preceding 5 calendar years; and  (C) in the case of a cattle processing plant that did not slaughter cattle during the immediately preceding 5 calendar years, the [USDA's] secretary shall consider the plant capacity of the processing plant in determining whether the processing plant should be considered a packer under this part.

7 U.S.C. § 1635d(5).

[5]After slaughter, a head of cattle is graded for quality as either USDA prime, choice, select or lower and then disassembled into fifty-six individual cuts of beef. Individual cuts are boxed together by grade and sold.  These sales represent the total value of the beef produced by a head of cattle, which value comprises about ninety percent of the worth of the animal.  The other ten percent comes from the hide, offal and other parts, and, perhaps, the "[t]ongue - a variety of meat rarely served because it clearly crosses the line between a cut of beef and a piece of dead cow." Thinkexist.com Quotations, http://thinkexist.com/search/searchquotation.asp?search =tongue+cow (last visited Dec. 18, 2007) (quoting Bob Ekstrom).

The USDA reports two categories of information to the public. The first type of information is the price for the fifty-six individual cuts of beef from a head of cattle. The USDA did not err in reporting this information. The second type of information the USDA provides, which was affected by the USDA's error, is the "cutout value." The USDA publishes the "cutout value" for choice and select grades of beef and for both heavy and light cattle. A "cutout value" is calculated by taking the average price of the fifty-six individual cuts of beef and inputting them into a formula to arrive at an average price for all cuts of beef.

The boxed beef prices that the packers report to the USDA, and the USDA subsequently releases to the public, are important to cattle sellers like the plaintiffs because research has shown that the boxed beef prices are related to fed cattle prices, that is, the amount per pound a cattle seller receives for a marketed animal. Thus, sellers look to the boxed beef prices, among other factors, to help them negotiate an appropriate selling price.

The USDA erroneously reported the cutout values to the public over a six-week period–April 2, 2001, to May 11, 2001. This error purportedly lowered the prices that the Packers paid individual sellers for their choice and select grade cattle. On May 16, 2001, the USDA issued a press release informing the public of its error in calculating the cutout values. The USDA then recalculated the errant values. These new values showed that the originally computed averages were incorrect and, indeed, lower than they should have been.

Once the putative class members learned of this error, several filed suit under the PSA alleging that four packers violated § 202(a) and (e). The district court ordered the plaintiffs to bring the suit as a class action. The suit then progressed to trial, and after each party's closing argument, the district court instructed the jury on the law of the case.

In jury instruction eleven, the district court instructed the jury that to find a violation of § 202(e), it must find that the defendant "[e]ngaged in any course of business or did any act for the purpose or with the effect of manipulating or controlling prices paid to class members." The district court further stated that "[p]laintiffs need not prove that defendants acted intentionally or with the intent to violate [§ 202(e)]." This was the only guidance the district court provided the jury on the PSA's legal standard. After deliberation, the jury returned a verdict finding the Packers violated § 202(e), but not § 202(a).

The Packers now appeal, hoping to show us how the cow ate the cabbage.[6] In this regard, the Packers contend the district court's guidance in jury instruction eleven incorrectly stated § 202(e)'s legal standard. Thus, the determinative issue in this appeal is what legal standard § 202(e) imposes on a plaintiff trying to prove a § 202(e) violation, and whether the district court's instruction complied with this standard. This appears to be a question of first impression.

## II.    DISCUSSION

Congress enacted the PSA in 1921 to, in part, regulate packers by preventing them from forming monopolies that would enable them to "unduly and arbitrarily . . . lower prices." Stafford v. Wallace, 258 U.S. 495, 514-15 (1922). Section 202(e) of the PSA makes it unlawful for any packer to "[e]ngage in any course of business or do any act for the *purpose or with the effect of manipulating or controlling* prices . . . ." 7 U.S.C. § 192(e) (emphasis added). The PSA does not provide a definition for any of the italicized words, and Congress did not articulate the legal standard anywhere in the legislative history.

---

[6]"How the cow ate the cabbage" is a southern expression used to indicate that the speaker is "telling it like it is" or telling someone what he needs to know but may not want to hear. Robert Hendrickson, Encyclopedia of Word and Phrase Origins, New York 1997.

In the absence of a statutory definition or clear contrary legislative intent, statutory terms are given their plain, ordinary, and commonly understood meaning. Cudworth v. Midcontinent Commc'ns, 380 F.3d 375, 381 (8th Cir. 2004). This court often turns to a commonly used dictionary to ascertain a word's ordinary meaning. Merriam-Webster's Collegiate Dictionary defines "manipulate" as follows: "to manage or utilize skillfully," or "to control or play upon by artful, unfair, or insidious means esp[ecially] to one's own advantage" or "to change by artful or unfair means so as to serve one's purpose." Merriam-Webster's Collegiate Dictionary 756 (11th ed. 2007). "Control," according to the same dictionary, means "[t]o exercise restraining or directing influence over," or "to have power over." Id. at 272. By using words such as "manage," "artful," "insidious," and "exercise," both definitions suggest that some culpability, such as intent, is required to violate the PSA.

Additionally, we have read similar statutory language as requiring proof of intent. For instance, in Utesch v. Dittmer, we held that "manipulate," as used in the Commodities Exchange Act, requires the defendant to "intentionally engage[] in" conduct. 947 F.2d 321, 327 (8th Cir. 1991). The United States Supreme Court, in the securities fraud context, has also interpreted "manipulation" to require "intentional or willful conduct." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 199 (1976).

What is more, the plaintiffs concede that the "purpose" tine of § 202(e) requires a showing of intent; however, they argue that the "effect" tine does not. Brief of Appellees at 31. We disagree. As we have already suggested, Congress' use of "manipulate" and "control" requires a showing of intent regardless of whether modified by "purpose" or "effect." And, Congress' use of "or" to separate "manipulating" and "controlling" does not require us to adopt a different interpretation. The word "or" as used in the phrase "manipulate *or* control," is used as a word of explanation showing the relationship between the word preceding it (manipulating) and the word following it (controlling). While the use of "or" generally connotes a disjunctive interpretation, this is not always the case. Indeed,

-7-

sometimes "or" is interpretative or expository of the preceding word.  Bowles v. Weiner, 6 F.R.D. 540, 542 (E.D. Mich. 1947).  For instance, "or" is often used in the sense of "to wit," "that is to say," or simply a broadened or narrowed explanation of the same thing.  Id.

We find that Congress intended "or" to be given an explanatory interpretation.  Indeed, "manipulate," according to Merriam-Webster's Collegiate Dictionary, is defined in terms of control.  Thus, under the statute, control is simply a more benign and slightly less invidious way of achieving manipulation, both requiring an intentional act to animate the result.

In sum, we conclude that to prove a violation of § 202(e), a plaintiff must show that a packer *intentionally* committed unlawful conduct.  Therefore, the district court erred when it instructed the jury that a showing of intent was not required and reversal of the district court is necessary.

Although we reverse the district court's judgment, which it entered after a jury trial, we need not remand the case for a new trial.  When the "evidence presented in the first trial would not suffice, as a matter of law, to support a jury verdict under the proper[]" legal standard, we can properly direct the district court to enter judgment for the appellant, without a new trial.  Boyle v. United Techs. Corp., 487 U.S. 500, 513 (1988).  Here, the plaintiffs produced no evidence that the Packers intentionally violated the PSA by manipulating or controlling (or attempting to manipulate or control) cattle prices.[7]  Thus, we reverse and direct the district court to enter judgment for the Packers.

---

[7]The plaintiffs also failed to produce legally sufficient evidence that the Packers knew or should have known of the USDA's error, or that the Packers had any duty to inform the plaintiffs if they did have such knowledge.

## III.  CONCLUSION

For the foregoing reasons, we reverse the district court's judgment and remand to the district court with directions to enter judgment in favor of the Packers.

_____