RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 19a0143p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

CHARLES BRIAN FOX and MEGAN FOX, Individually
and as Parents and Next Friends of HAILEY FOX;
MATTHEW FOX; REBECCA FOX; SARAH FOX,

         *Plaintiffs-Appellants*,

     *v.*

AMAZON.COM, INC.,

         *Defendant-Appellee*.

> No. 18-5661

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 3:16-cv-03013—William Lynn Campbell, Jr., District Judge.

Argued: March 14, 2019

Decided and Filed: July 5, 2019

Before: CLAY and STRANCH, Circuit Judges; PEARSON, District Judge.[*]

───────────────

## COUNSEL

**ARGUED:** Steven E. Anderson, ANDERSON & REYNOLDS, PLC, Nashville, Tennessee, for
Appellants. Brendan Murphy, PERKINS COIE LLP, Seattle, Washington, for Appellee.
**ON BRIEF:** Steven E. Anderson, ANDERSON & REYNOLDS, PLC, Nashville, Tennessee,
Mark E. Spear, Kaylin L. Hart, SPEAR, SPEAR & HAMBY, P.C., Mobile, Alabama, Donald
Capparella, DODSON PARKER BEHM & CAPPARELLA, P.C., Nashville, Tennessee, for
Appellants. Brendan Murphy, Eric D. Miller, Rachel Constantino-Wallace, PERKINS COIE LLP,

───────────────

[*]The Honorable Benita Y. Pearson, United States District Judge for the Northern District of Ohio, sitting by
designation.

Seattle, Washington, Lela M. Hollabaugh, Scott Burnett Smith, BRADLEY ARANT BOULT CUMMINGS LLP, Nashville, Tennessee, for Appellee.

————————————

**AMENDED OPINION**

————————————

CLAY, Circuit Judge.  Plaintiffs Charles Brian and Megan Fox, individually and as parents and next friends of their minor children Hailey, Matthew, Rebecca, and Sarah Fox, appeal the district court's May 30, 2018 order granting summary judgment in favor of Defendant Amazon.com, Inc.  Plaintiffs' complaint alleges that Defendant (1) sold Plaintiff Megan Fox a defective or unreasonably dangerous product, in violation of the Tennessee Products Liability Act of 1978, Tenn. Code Ann. § 29-28-101 *et seq.*, (2) breached a duty to warn Plaintiff Megan Fox about the defective or unreasonably dangerous nature of that product, in violation of Tennessee tort law, and (3) caused Plaintiff Megan Fox confusion or misunderstanding about the source of that product, in violation of the Tennessee Consumer Protection Act of 1977, Tenn. Code Ann. § 47-18-101 *et seq.*  For the reasons set forth below, we **AFFIRM IN PART** and **REVERSE IN PART** the district court's summary judgment order.

## BACKGROUND

### Factual Background

Plaintiffs are a family of six that resides in Davidson County, Tennessee.  Defendant is a corporation that operates a worldwide online marketplace.  Defendant's marketplace facilitates the sale of products from sellers, including both Defendant and third-party sellers, to buyers.[1]  W2M Trading Corp. ("W2M") is a corporation that at one time was a third-party seller that utilized Defendant's marketplace to sell hoverboards.

---

[1]There has been significant disagreement over how to characterize sellers, other than Defendant, that utilize Defendant's marketplace.  Plaintiffs characterize them as "co-sellers."  Defendant characterizes them as "third-party sellers."  And the district court characterized them as "sellers."  We refer to such sellers as "third-party sellers" because that term accurately and appropriately reflects the fact that they are sellers, *other than Defendant*, that utilize Defendant's marketplace.  *See Hart v. Amazon.com, Inc.*, 845 F.3d 802, 803 (7th Cir. 2017) (referring to "third-party sellers"); *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 234 n.4 (2d Cir. 2016) (referring to "third-party sellers"); *Multi Time Machine, Inc. v. Amazon.com, Inc.*, 804 F.3d 930, 933 (8th Cir. 2015) (referring to "third-party sellers").

In November 2015, Defendant's marketplace contained a webpage offering for sale a FITURBO F1 hoverboard. The webpage contained, among other things, the purchase price, $274.79, and a detailed product description, including that the hoverboard was equipped with an "original Samsung advanced battery pack." (RE 150, PageID # 2117.)[2] Defendant did not set the purchase price or develop any of the product-related content that appeared on the webpage.

On November 3, 2015, Plaintiff Megan Fox accessed the webpage and purchased a FITURBO F1 hoverboard. At that time, Plaintiff believed that Defendant owned the hoverboard, and that she purchased the hoverboard from Defendant. However, Defendant's records show that W2M owned the hoverboard, and that Plaintiff purchased the hoverboard from W2M. For instance, Plaintiff's order history lists the hoverboard's "[s]eller of record" as "W2M Trading Corp."[3] (RE 120, PageID # 1566.) Neither Defendant nor W2M manufactured the hoverboard; the manufacturer remains unknown.

Plaintiff Megan Fox paid the purchase price to Defendant, and the purchase receipt was sent from "amazon.com" to Plaintiff's email address. (RE 161, PageID # 2205.) The receipt contained various details about the purchase, including the order date, the shipment date, the shipping address, and the billing address. The receipt also contained the phrase, "Sold by: -DEAL-." (*Id.*)

Defendant operates a program known as "Fulfillment by Amazon" ("FBA"), through which third-party sellers can opt to use storage and shipping services offered by Defendant. If a third-party seller participates in FBA, its products are stored in an Amazon Fulfillment Center until they are purchased, at which point Defendant ships the products to the buyers. Participants in FBA pay a fee to Defendant for these services, but retain title to their products.

The parties disagree over whether W2M participated in FBA, and accordingly over whether W2M or Defendant stored and shipped the hoverboard purchased by Plaintiff Megan Fox.

---

[2]Except as otherwise indicated, record citations refer to the record in district court action No. 16-cv-03013.

[3]Plaintiff's order history also states that the hoverboard was "[s]old by: W-Deals," and that the "[s]eller name" was "W-Deals." (RE 120, PageID # 1566.) W2M chose the name "W-Deals," as well as the name "-DEAL-," pursuant to Defendant's policy permitting third-party sellers to choose "friendly names" by which they could be identified as a seller of their products. (RE 119-1, PageID # 1500.)

Defendant's records show that, in 2015, W2M participated in FBA for some of the products it sold on Defendant's marketplace. Additionally, the hoverboard purchased by Plaintiff was shipped from China via Federal Express, arrived in an Amazon-labeled box, and its Amazon Standard Identification Number ("ASIN") was B00WGX04YM. And Defendant's records show that, in 2015, Defendant had Amazon Fulfillment Centers in China, shipped items via Federal Express in Amazon-labeled boxes, and stored a hoverboard with the ASIN B00WGX04YM. However, Defendant's records also show that multiple third-party sellers sold hoverboards with the ASIN B00WGX04YM, and that Plaintiff's hoverboard was "[f]ulfilled by: W-Deals." (RE 120, PageID # 1566.) Plaintiff received the hoverboard sometime between November 10, 2015 and November 17, 2015.

Defendant requires all third-party sellers that utilize its marketplace to sign Defendant's Business Solutions Agreement ("BSA"). The BSA provides in part that third-party sellers are prohibited from direct communication with buyers. Rather, all communication with buyers comes from Defendant. The BSA also provides that Defendant retains initial control over customer payments. Generally, customers pay Defendant, and Defendant then remits those payments to third-party sellers every 14 days. However, Defendant retains the right to impose a 90-day hold on those payments.

The parties disagree over whether Defendant remitted Plaintiff Megan Fox's payment to W2M. Defendant's records show that from January 1, 2015 through December 31, 2016, Defendant remitted approximately $1.4 million in customer payments to W2M. However, Defendant's records do not show that Plaintiff's payment specifically was remitted to W2M.

Sometime in November 2015, following news reports of hoverboard fires and explosions, Defendant began a thorough internal investigation into the dangers posed by hoverboards. That investigation identified at least 17 complaints of hoverboard fires or explosions in the United States that involved hoverboards purchased on Defendant's marketplace. For instance, on November 30, 2015, a customer sent an email to Defendant's CEO, Jeff Bezos, informing Bezos that a hoverboard the customer had purchased had burst into flames while his daughter was riding it.

Based on the results of the investigation, Damon Jones, Defendant's product safety manager, was concerned that the entire product category of hoverboards was "bad." (RE 117-5, PageID # 1265.) In his view, "there was no precedent for this kind of event in the product safety community," in part because of the "widespread nature of the problem." (*Id.* at PageID # 1264–65.) On December 10, 2015, the results were presented to "a broad set of senior decision-makers" at Defendant. (*Id.* at PageID # 1258.) By that time, Damon Jones had removed his own hoverboard from his home.

On December 11, 2015, Defendant ceased all hoverboard sales worldwide. At that time, Defendant knew that approximately 250,000 hoverboards had been sold on its marketplace in the previous 30 days. At that time, Defendant knew that approximately 25% of those hoverboards had not yet been delivered. Also at that time, Defendant knew that it was likely that a majority of those hoverboards would remain unopened until the holiday season in late December. As a result, Defendant made "contingency plans" in anticipation of more fires and explosions, including scheduling employees to work on December 26, 2015 in order to monitor news reports and customer complaints about hoverboard fires and explosions. (RE 161, PageID # 2209.)

On December 12, 2015, Defendant sent an email to hoverboard purchasers that Defendant described as intended to be "non-alarmist" because it would likely be "headline news." (*Id.* at PageID # 2210.) The subject line of the email stated: "Important Product Safety Notification Regarding your Amazon.com Order." (RE 117-17, PageID # 1402.) The body of the email stated: "There have been news reports of safety issues involving products like the one you purchased that contain rechargeable lithium-ion batteries. As a precaution, we want to share with you some additional information about lithium-ion batteries and safety tips for using products that contain them." (*Id.*) The email included a link for the "information and safety tips," a link "to initiate a return," and a request that the recipient "pass along this information" to the proper person if the hoverboard was purchased for someone else. (*Id.*) The email did not inform hoverboard purchasers of any of the actions Defendant had taken to evaluate the dangers posed by hoverboards, including the findings and results of its internal investigation. The email did not inform hoverboard purchasers that the reported safety issues included a risk of fire and explosion. And the email did not inform hoverboard purchasers that Defendant had ceased all hoverboard sales worldwide.

The December 12, 2015 email was sent to Plaintiff Megan Fox. Plaintiff does not recall receiving or reading the email. However, Plaintiff "had a habit" of reading emails sent to her email address. (RE 161, PageID # 2210.) Plaintiff testified that she would not have let the hoverboard enter or remain in her home had she known that there had been 17 complaints of hoverboard fires or explosions in the United States that involved hoverboards purchased on Defendant's marketplace, that Defendant anticipated additional complaints during the holiday season in late December, or that Defendant had ceased all hoverboard sales worldwide.

On January 9, 2015, Matthew Fox was playing with his new hoverboard while the rest of the family was away from the home. Eventually, he stopped playing with the hoverboard and left it on the first floor of the family's two-story home. When Hailey Fox returned to the home, she sent a text message to Plaintiff Megan Fox stating that she thought that someone had broken into the home. Plaintiff Megan Fox alerted Plaintiff Charles Brian Fox of Hailey's message, and he drove home immediately, accompanied by Sarah and Rebecca Fox. By the time he arrived, Matthew and Hailey had hidden on the second floor of the home, fearing an intruder.

When Plaintiff Charles Brian Fox arrived, the home was on fire, and Matthew and Hailey were trapped on the second floor. He frantically searched for a way to enter the home, but the intensity of the fire prevented him from getting inside. He then heard Hailey banging on a second-floor window. At his instruction, Hailey broke the window, and jumped out. He attempted to break her fall. He then heard Matthew banging on another second-floor window. Again, at his instruction, Matthew broke the window, and jumped out. Plaintiff Megan Fox arrived shortly thereafter to find that everyone had escaped from the home, but that the fire was still raging. As a result of the fire, the members of the Fox family suffered various physical and psychological injuries, and their home, along with virtually all of the personal property contained therein, was destroyed.

It is undisputed that the fire was caused by the lithium-ion battery in Plaintiff Megan Fox's hoverboard.

## Procedural History

Plaintiffs filed a complaint in the United States District Court for the Middle District of Tennessee against Defendant and W2M.[4] Plaintiffs' complaint alleges that Defendant (1) sold Plaintiff Megan Fox a defective or unreasonably dangerous product, in violation of the Tennessee Products Liability Act of 1978, Tenn. Code Ann. § 29-28-101 *et seq.*, (2) breached a duty to warn Plaintiff Megan Fox about the defective or unreasonably dangerous nature of that product, in violation of Tennessee tort law, and (3) caused Plaintiff Megan Fox confusion or misunderstanding about the source of that product, in violation of the Tennessee Consumer Protection Act of 1977, Tenn. Code Ann. § 47-18-101 *et seq.* (*Id.*) Following discovery, Plaintiffs filed a motion for partial summary judgment, and Defendant filed a motion for summary judgment. On May 30, 2018, the district court granted Defendant's motion for summary judgment, reasoning that all of Plaintiffs' claims failed as a matter of law.

This appeal followed.

## DISCUSSION

### I. Standard of Review and Applicable Law

We review a district court's grant of summary judgment *de novo*, "drawing all reasonable inferences in favor of the nonmoving party." *Rocheleau v. Elder Living Const., LLC*, 814 F.3d 398, 400 (6th Cir. 2016) (quotation omitted). Summary judgment is appropriate where the movant demonstrates that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Accordingly, summary judgment must be entered where the nonmovant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *United States v. Storey*, 640 F.3d 739, 743 (6th Cir. 2011) (quotation omitted).

---

[4]Plaintiffs have since obtained a default judgment against W2M.

Where, as here, our subject matter jurisdiction is based on diversity of citizenship, we apply the substantive law of the forum state. *Berrington v. Wal-Mart Stores, Inc.*, 696 F.3d 604, 607 (6th Cir. 2012). "Faithful application of a state's law requires federal courts to 'anticipate how the relevant state's highest court would rule in the case.'" *Id.* (quotation omitted). Thus, we are bound by controlling decisions of that court, and in the absence of decisions addressing the issue, must predict how that court would rule by looking to "all available data." *Id.* (quotation omitted). However, this Court has often warned that "[f]ederal courts should be 'extremely cautious about adopting substantive innovation in state law.'" *Id.* at 608 (quotation omitted).

## II. Analysis

### A. Plaintiffs' Tennessee Products Liability Act ("TPLA") Claim

The TPLA provides that a "manufacturer" or "seller" of a product may be liable for personal injury or property damage caused by that product if it was "in a defective condition or unreasonably dangerous at the time it left the control of the manufacturer or seller." Tenn. Code Ann. § 29-28-105(a). "Manufacturer" is defined as "the designer, fabricator, producer, compounder, processor, or assembler of [a] product or its component parts." *Id.* § 29-28-102(4). And "seller" is defined as "any individual or entity engaged in the business of selling a product," including a "retailer," "wholesaler," or "distributor," as well as a "lessor" engaged in the business of leasing a product and a "bailor" engaged in the business of bailment of a product. *Id.* § 29-28-102(7).

At issue in this case is whether Defendant is a "seller" of Plaintiff Megan Fox's hoverboard. Defendant argues that it "never had title to the hoverboard" and thus could not sell it. (Brief for Appellee at 16.) Plaintiffs argue that Defendant "controlled all aspects of the [hoverboard] sales transaction" and thus effectively sold it. (Brief for Appellants at 20.) We begin, as we must, with "the natural and ordinary meaning of the language used." *Penley v. Honda Motor Co.*, 31 S.W.3d 181, 185 (Tenn. 2000) (quotation omitted).

The TPLA's definition of "seller" hinges on an individual's or entity's engagement "in the business of selling." Tenn. Code Ann. § 29-28-102(7). Parsing this phrase, to "sell" generally means to dispose of property "by sale." *See Sell*, Black's Law Dictionary (4th ed. 1968); *Sell*,

Black's Law Dictionary (10th ed. 2014). A "sale" is generally a transfer of title to or possession of property for an agreed upon price, or the agreement by which such a transfer takes place. *See Sale*, Black's Law Dictionary (4th ed. 1968); *Sale*, Black's Law Dictionary (10th ed. 2014). And to be engaged "in the business of" something generally means to be regularly engaged in it for livelihood or gain. *See Business*, Black's Law Dictionary (4th ed. 1968); *Business*, Black's Law Dictionary (10th ed. 2014); *see also Rollins v. Cherokee Warehouses, Inc.*, 635 F. Supp. 136, 138 (E.D. Tenn. 1986).

Accordingly, one possible construction of the TPLA's definition of "seller" is any individual or entity regularly engaged in transferring title to a product for an agreed upon price, for livelihood or gain. Defendant argues that we should adopt this construction because it accords with the Uniform Commercial Code, which Tennessee has adopted in relevant part. Specifically, the Uniform Commercial Code defines "seller" as "a person who sells or contracts to sell goods," and defines "sale" as "the passing of title from the seller to the buyer for a price." Tenn. Code Ann. §§ 47-2-103(1)(d), 47-2-106(1).

However, we are not persuaded that the Tennessee legislature intended such a limited construction. *See Spires v. Simpson*, 539 S.W.3d 134, 143 (Tenn. 2017) ("The cardinal rule of statutory construction is to effectuate legislative intent, with all rules of construction being aides to that end."). Significantly, the TPLA's definition of "seller" expressly includes a "lessor" and a "bailor," neither of which necessarily transfers title to the products they lease or bail. *See, e.g.*, *Bailment*, Black's Law Dictionary (10th ed. 2014) ("Unlike a sale or gift of personal property, a bailment involves a change in possession but not in title."). Thus, this construction would result in a definition of "seller" that *excludes* examples that the legislature explicitly *included*. And "[a]n important canon of statutory construction counsels that a statute . . . should be interpreted to preclude any part from being 'inoperative, superfluous, void, or insignificant.'" *Baker v. State*, 417 S.W.3d 428, 439 n.11 (Tenn. 2013) (quotation omitted).

The Tennessee Supreme Court's decision in *Baker v. Promark Products West, Inc.*, 692 S.W.2d 844 (Tenn. 1985) is instructive. In that case, the court held that a TPLA claim for breach of implied warranty can be maintained against a lessor or bailor of personal property, notwithstanding the fact that the Uniform Commercial Code provided that the warranty was

implied only in certain contracts for "sale." *Id.* at 847. The court reasoned that the legislature "carefully considered who was to be a 'seller' in a products liability action," and that the legislature's inclusion of "lessor" and "bailor" in the TPLA's definition of "seller" demonstrated its intent "to extend protection for products liability injuries *beyond the technical buyer-seller relationship* encompassed by a strict interpretation of the Uniform Commercial Code." *Id.* (emphasis added). Accordingly, the court stated that in a products liability action for breach of implied warranty, no actual "sale" need occur, whereas "if the action is not a products liability action . . . an actual 'sale' [is] required." *Id.*

This Court's decision in *Winningham v. Ciba-Geigy Corp.*, 156 F.3d 1234 (6th Cir. July 14, 1998) (Table) is similarly instructive. In that case, this Court held that the TPLA's statute of repose applies to bailments, notwithstanding the fact that it runs from the date on which the product was "purchased." *Id.* at *3. This Court reasoned that the legislature's inclusion of "lessor" and "bailor" in the TPLA's definition of "seller" demonstrated its intent that the statute of repose apply regardless of the occurrence of an actual sale. *Id.* Accordingly, this Court stated that the plaintiffs' argument "that no title passed . . . and thus no sale occurred . . . ignore[d] the definition of the term 'seller' in the TPLA." *Id.* Thus, it would seem that the TPLA's definition of "seller" is not limited to any individual or entity regularly engaged in transferring title to a product for an agreed upon price, for livelihood or gain.

Another possible construction of the TPLA's definition of "seller" is any individual or entity regularly engaged in exercising sufficient control over a product in connection with its sale, lease, or bailment, for livelihood or gain. Plaintiffs argue that we should adopt this construction because it accords with the text of the TPLA and Tennessee case law.

Plaintiffs' argument is persuasive. Unlike the construction urged by Defendant, this construction is broad enough to include all of the TPLA's examples of a "seller"—a "retailer," a "wholesaler," a "distributor," a "lessor," and a "bailor," Tenn. Code Ann. § 29-28-102(7)—each of which exercises a significant degree of control over the products they sell, lease, or bail. This construction also accords with Tenn. Code. Ann. § 29-28-105(a), the "key operative provision" of the TPLA, *Whitehead v. Toyota Motor Corp.*, 897 S.W.2d 684, 689 (Tenn. 1995), and with Tennessee case law. As stated above, § 29-28-105(a) provides that the liability of a

"manufacturer" or "seller" is contingent upon whether the product was "in a defective condition or unreasonably dangerous at the time it left the *control* of the manufacturer or seller." (emphasis added). And in *Baker*, the Tennessee Supreme Court explained that a TPLA claim for breach of implied warranty can be maintained "[r]egardless of whether title passes in the transaction" because "one party to the relationship is in a better position to know and *control* the condition of the chattel." 692 S.W.2d at 848 (emphasis added). Thus, both the legislature and Tennessee Supreme Court have indicated that control is an important consideration underlying products liability law.

Moreover, this construction is consistent with the remedial purpose of the TPLA. "A primary purpose of [the TPLA] is 'to ensure that an injured consumer may maintain a strict liability action against whomever is most likely to compensate him for his injuries.'" *Owens v. Truckstops of Am.*, 915 S.W.2d 420, 432 (Tenn. 1996) (quotation omitted). In furtherance of that purpose, the TPLA plainly provides that where the manufacturer and others in the chain of distribution are "not amenable to service of process," "insolvent," or unknown, "an injured consumer can assert liability against [a] 'faultless' seller. *Id.* Otherwise, "the injured consumer would be left with no remedy." *Id.*; *see also Baker*, 692 S.W.2d at 848.

In this case, Defendant is clearly the entity "most likely to compensate" Plaintiffs for their injuries. *See Owens*, 915 S.W.2d at 432. The third-party seller and manufacturer of Plaintiff Megan Fox's hoverboard, to whom Plaintiffs might otherwise look for compensation, appear to be judgment-proof and unknown respectively. And Defendant certainly has the capacity to compensate Plaintiffs, as it accounts for 49.1% of all online retail spending in the United States, nearly more than all other online retailers combined, and generated $141.92 billion in product sales in 2018, including $13.38 billion in fees paid by third-party sellers in the fourth quarter alone.[5] The combination of these two facts—Defendant's ability to facilitate the sale of goods by sellers who are functionally outside the reach of U.S. courts, and its online retail dominance—often

---

[5]*See* Ingrid Lunden, *Amazon's Share Of The US E-Commerce Market Is Now 49%, Or 5% Of All Retail Spend*, TechCrunch (July 13, 2018), https://techcrunch.com/2018/07/13/amazons-share-of-the-us-e-commerce-market-is-now-49-or-5-of-all-retail-spend/ (last visited March 29, 2019); Allison Enright, *Amazon's Product Sales Climb Nearly 20% in 2018, But Only 8% In Q4*, Digital Commerce 360 (Jan. 31, 2019), https://www.digitalcommerce360.com/article/amazon-sales/ (last visited March 29, 2019).

drastically hinders the ability of consumers injured by defective or unreasonably dangerous products to receive compensation for their injuries.

Defendant also has the capability to spur the manufacturing and sale of safer products in the future, which is a primary purpose behind the doctrine of products liability in general. *See Owens*, 915 S.W.2d at 432; *Baker*, 692 S.W.2d at 847. That capability can indeed be seen in several of the facts of this case. Defendant required W2M to sign its BSA, which imposed various restrictions on W2M's ability to sell products on Defendant's marketplace. Defendant attempted to demand safety compliance documentation from third-party hoverboard sellers following initial reports of hoverboard fires and explosions. And Defendant eventually ceased all hoverboard sales on its marketplace worldwide.

Lastly, we note that courts applying the products liability law of other states have also considered or adopted constructions of "seller" or other similar terms that hinge on the degree of control exercised over a product. *See, e.g.*, *Erie Ins. Co. v. Amazon.com, Inc.*, _ F.3d _, No. 18-1198, 2019 WL 2195146, at *3 (4th Cir. May 22, 2019); *Garber v. Amazon.com, Inc.*, _ F. Supp. 3d _, No.17-C-673, 2019 WL 1437877, at *7 (N.D. Ill. Mar. 31, 2019); *Carpenter v. Amazon.com, Inc.*, No. 17-03221-JST, 2019 WL 1259158, at *4 (N.D. Cal. Mar. 19, 2019); *Eberhart v. Amazon.com, Inc.*, 325 F. Supp. 3d 393, 398–99 (S.D.N.Y. 2018); *Allstate N.J. Ins. Co. v. Amazon.com, Inc.*, No. 17-2738, 2018 WL 3546197, at *7–10 (D.N.J. July 24, 2018); *Oberdorf v. Amazon.com, Inc.*, 295 F. Supp. 3d 496, 498 (M.D. Pa. 2017); *see also Stiner v. Amazon.com, Inc.*, 120 N.E.3d 885, 895 (Ohio Ct. App. 2019).

Thus, we hold that the TPLA's definition of "seller" means any individual regularly engaged in exercising sufficient control over a product in connection with its sale, lease, or bailment, for livelihood or gain. We turn next to an application of that definition to the facts of this case.

Plaintiffs argue that Defendant exercised sufficient control over Plaintiff Megan Fox's hoverboard because Defendant (1) stored and shipped the hoverboard, (2) initially obtained the payment made in exchange for the hoverboard, (3) retained the payment made in exchange for the hoverboard, and (4) handled all communications with Plaintiff Megan Fox regarding the

hoverboard. However, Plaintiffs' first and third assertions are belied by the record. Defendant's records demonstrate both that the hoverboard was "[f]ulfilled by: W-Deals," (RE 120, PageID # 1566.), and that Defendant remitted approximately $1.4 million in customer payments to W2M between January 1, 2015 and December 31, 2016, a time period which includes Plaintiff Megan Fox's hoverboard purchase. Plaintiffs ask us to infer that stray pieces of circumstantial evidence cast doubt on the accuracy of these records, and stress that this case is at the summary judgment stage; but summary judgment "does not allow, much less require that we draw strained and unreasonable inferences in favor of the nonmovant." *Audi AG v. D'Amato*, 469 F.3d 534, 545 (6th Cir. 2006) (quotation omitted).

What remains—Plaintiff's second and fourth assertions—is not a sufficient exercise of control to be deemed a "seller" under the TPLA. In contrast to those assertions, Defendant did not choose to offer the hoverboard for sale, did not set the price of the hoverboard, and did not make any representations about the safety or specifications of the hoverboard on its marketplace. We also note that courts applying the products liability law of other states to comparable facts have reached similar conclusions. *See, e.g.*, *Garber*, 2019 WL 1437877, at *7, *10; *Carpenter*, 2019 WL 1259158, at *5; *Stiner*, 120 N.E.3d at 895. At bottom, we are not convinced, on the record before us, that Defendant exercised sufficient control over Plaintiff Megan Fox's hoverboard to be deemed a "seller" of the hoverboard under the TPLA. Thus, we hold that there is no genuine dispute of material fact regarding Plaintiffs' TPLA claim, and affirm the district court's dismissal.**[6]**

### B.  Plaintiffs' Tennessee Tort Law Claim

Tennessee tort law provides that an individual can assume a duty to act, and thereby become subject to the duty of acting reasonably. *Grogan v. Uggla*, 535 S.W.3d 864, 871 (Tenn. 2017). In evaluating whether such a duty has been assumed, Tennessee courts look to the Restatement (Second) of Torts §§ 323, 324A. *Id.* at 873; *see also Downs v. Bush*, 263 S.W.3d 812, 820 (Tenn. 2008). Section 323 states:

---

**[6]**Accordingly, we need not decide whether the Communications Decency Act, 47 U.S.C § 230, grants Defendant immunity from Plaintiffs' TPLA claim.

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to the liability *to the other* for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, or
>
> (b) the harm is suffered because of the other's reliance upon the undertaking.

Restatement (Second) of Torts § 323 (emphasis added). And § 324A states:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability *to the third person* for physical harm resulting from his failure to exercise reasonable care to protect his undertaking if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, or
>
> (b) he has undertaken to perform a duty owed by the other to the third person, or
>
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts § 324A (emphasis added).

Evidently, the rule stated in § 324A "parallels the one stated in § 323." *Grogan*, 535 S.W.3d at 873 n.10 (quotation omitted). However, the emphasized references in the Restatement highlight a crucial difference. Section 323 governs liability to the person to whom the defendant undertook to render services, while § 324A governs liability to persons *other than* the person to whom the defendant undertook to render services. *Id.*

In this case, Plaintiffs allege that Defendant gratuitously undertook to warn Plaintiff Megan Fox of the dangers posed by the hoverboard when it sent her the December 12, 2015 email, that Defendant was negligent in that undertaking, and that Defendant's negligence caused them harm. The district court held that § 324A was inapplicable to Plaintiffs' claims because it "contemplate[d] liability to third parties." (RE 161, PageID # 2221–22.) And the district court also held that Plaintiffs forfeited any § 323 claim. Both holdings were erroneous.

By its plain terms, § 324A governs liability to persons other than the person to whom the defendant undertook to render services. *Grogan* 535 S.W.3d at 872–73 & n.10. For instance, in *Biscan v. Brown*, the plaintiff argued that the defendant undertook to monitor minors at a party at

which alcohol was served, and that the defendant's negligent monitoring caused physical harm to the plaintiff—a motorist who was injured in a car accident with an intoxicated minor who had attended the party.  160 S.W.3d 462, 483 (Tenn. 2005).  Similarly, in this case, Plaintiffs argue that Defendant undertook to warn Plaintiff Megan Fox when it sent her the December 12, 2015 email, and that Defendant's negligent warning caused physical harm to the other members of her family.  Accordingly, while Defendant's liability to Plaintiff Megan Fox is properly governed by § 323, Defendant's liability to the other members of her family is properly governed by § 324A.[7] *See Grogan*, 535 S.W.3d at 872–73.  Thus, the district court's holding that § 324A was inapplicable to Plaintiffs' Tennessee tort law claim was erroneous.

Applying § 323 and § 324A to the facts of this case, Defendant chose to send the December 12, 2015 email to Plaintiff Megan Fox, and in doing so plainly sought to warn her of the dangers posed by the hoverboard.  The body of the email stated:  "There have been news reports of safety issues involving products like the one you purchased that contain rechargeable lithium-ion batteries.  As a precaution, we want to share with you some additional information about lithium-ion batteries and safety tips for using products that contain them."  (RE 117-17, PageID # 1402.) And Defendant just as plainly recognized the warning as necessary for the protection of Plaintiff Megan Fox, a third party, or their things.  The body of the email also specifically requested that the recipient "pass along this information" to the proper person if the hoverboard was purchased for someone else.  (*Id.*)  Thus, we hold that Defendant assumed a duty to warn Plaintiff Megan Fox of the dangers posed by the hoverboard when it sent her the December 12, 2015 email.  *See Grogan*, 535 S.W.3d at 874 ("[T]he question of whether one has assumed a duty to act is . . . a question of law.") (alterations in original) (quotation omitted).

Given that Defendant assumed a duty to act, there remain genuine issues of material fact regarding whether Defendant breached that duty and whether any breach caused Plaintiffs physical harm.  For instance, there is a genuine issue of material fact regarding whether Defendant's failure to include certain information in the December 12, 2015 email amounted to negligence.  The email did not inform hoverboard purchasers of any of the actions Defendant had taken to evaluate the

_____

[7]Plaintiff Megan Fox properly pleaded, and argued before the district court, that Defendant violated § 323. (*See* RE 154, PageID # 2164.) Thus, the district court's holding that Plaintiffs forfeited any § 323 claim was erroneous.

dangers posed by hoverboard, including the findings and results of its internal investigation.  The email did not inform hoverboard purchasers that the reported safety issues included a risk of fire or explosion.  And the email did not inform hoverboard purchasers that Defendant had ceased all hoverboard sales worldwide.

Additionally, there is a genuine issue of material fact regarding whether Plaintiff Megan Fox read the December 12, 2015 email, and thereby could have acted in reliance on it.  Such reliance is required by subsection (b) of § 323 and subsection (c) of § 324A, one of multiple subsections under which Plaintiffs' claim may proceed.   Though Plaintiff has no specific recollection of reading the email, she "had a habit" of reading emails sent to her email address.  (RE 161, PageID # 2210.)  Plaintiff also testified that she would not have let the hoverboard enter or remain in her home had she known, among other things, that there had been 17 complaints of hoverboard fires or explosions in the United States that involved hoverboards purchased on Defendant's marketplace, that Defendant anticipated additional complaints, particularly during the holiday season in late December, or that Defendant had ceased all hoverboard sales worldwide.

Thus, we hold that there are genuine disputes of material fact regarding Plaintiffs' Tennessee tort law claim, and reverse the district court's dismissal.[8]

## C.  Plaintiffs' Tennessee Consumer Protection Act ("TCPA") Claim

The TCPA prohibits "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commence," including "[c]ausing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services."  Tenn. Code Ann. § 47-18-104(a), (b)(2).  In this case, Plaintiffs allege that Defendant's policy allowing third-party sellers to choose "friendly names" by which they would be identified as a seller of their products caused a likelihood of confusion or misunderstanding as to the source of the hoverboard.  Specifically, Plaintiffs allege that Defendant's policy deceptively caused Plaintiff Megan Fox to believe that Defendant owned the hoverboard, and that she was purchasing the hoverboard from Defendant.

---

[8]Defendant concedes that the Communications Decency Act, 47 U.S.C § 230, does not grant it immunity from Plaintiffs' Tennessee tort law claim.  (RE 120, PageID # 1583.) ("All of Plaintiffs' claims except those arising from the December 12 email require treating Amazon as a publisher of W-Deals' offer.").

The district court held that Plaintiffs did not "demonstrate a sufficient causal link" to state their TCPA claim. (RE 161, PageID # 2227.) On appeal, Plaintiffs argue (1) that they did demonstrate a sufficient causal link, and (2) that the district court erroneously granted summary judgment on grounds not briefed by the parties. Defendant argues that the district court properly determined that Plaintiffs did not demonstrate a sufficient causal link.

In order to prevail on a claim under the TCPA, "the alleged unfair or deceptive act or practice must in fact cause the damages of which the plaintiff complains." *White v. Early*, 211 S.W.3d 723, 743 (Tenn. Ct. App. 2006). Accordingly, Plaintiffs must demonstrate that Plaintiff Megan Fox would not have purchased the hoverboard but for W2M's choice and use of the "friendly names" "W-Deals" and "-DEAL-." Plaintiffs rely solely on Plaintiff Megan Fox's affidavit to satisfy this element of their TCPA claim.

Plaintiff's affidavit states that she "do[es] not recall noticing the name '-DEAL-' as the seller of the hoverboard." (RE 146-3, PageID # 1942.) While it also states that "even if [she] had noticed the name '-DEAL-' as the '[s]eller'" she would not have "recognized or understood those names to refer to a third-party seller," that statement does not demonstrate the requisite causal link. It does not establish that but for W2M's choice and use of the "friendly names" "W-Deals" and "-DEAL-" Plaintiff would not have purchased the hoverboard. *See Hamlin v. Trans-Dapt of Cal., Inc.*, 584 F. Supp. 2d 1050, 1058 (M.D. Tenn. 2008) (granting judgment as a matter of law on a TCPA claim because "there [was] no indication that [the plaintiff's] loss was caused by . . . reliance on a false impression" created by the defendant).

Plaintiffs also argue that the district court improperly granted summary judgment on causation grounds because causation was not briefed by the parties. *See Smith v. Perkins Bd. of Educ.*, 708 F.3d 821, 828 (6th Cir. 2013). However, Defendant asserted in support of its motion for summary judgment that Plaintiffs "d[id] not tie any Amazon conduct to any acts or practices declared unlawful by Section 47-18-104(b) of the TCPA." (RE 120, PageID # 1579.) This assertion was sufficient to put Plaintiffs "on notice that [they] had to muster the necessary facts to withstand summary judgment" on causation grounds. *Smith*, 708 F.3d at 829.

Thus, we hold that there is no genuine issue of material fact regarding Plaintiffs' TCPA claim, and affirm the district court's dismissal.[9]

## CONCLUSION

For the reasons set forth above, we **AFFIRM** the district court's summary judgment order with respect to Plaintiffs' TPLA and TCPA claims, and **REVERSE** the district court's summary judgment order with respect to Plaintiffs' Tennessee tort law claim.

---

[9]Accordingly, we need not decide whether the Communications Decency Act, 47 U.S.C. § 230, grants Defendant immunity from Plaintiffs' TCPA claim.