# United States Court of Appeals
## For the Eighth Circuit

_____

No. 24-3042
_____

Gina Christopherson, individually and on behalf of all those similarly situated

*Plaintiff - Appellant*

v.

Cinema Entertainment Corporation

*Defendant - Appellee*
_____

Appeal from United States District Court
for the District of Minnesota
_____

Submitted: May 15, 2025
Filed: December 8, 2025
_____

Before BENTON, GRASZ, and STRAS, Circuit Judges.
_____

STRAS, Circuit Judge.

Are movie theaters "engaged in the business" of "rent[ing], [selling], or deliver[ing] . . . prerecorded video cassette tapes or similar audio visual materials"? 18 U.S.C. § 2710(a)(4). The district court[1] concluded the answer was no, which

---

[1]The Honorable Nancy E. Brasel, United States District Judge for the District of Minnesota.

meant that Cinema Entertainment Corporation was not liable under the Video Privacy Protection Act for sharing Gina Christopherson's personal information. *See id.* § 2710(b)(1). We affirm.

## I.

Cinema Entertainment screens movies in its theaters across four midwestern states, including Minnesota. Getting customers in the seats is how it makes money, both through selling tickets and offering concessions. One way it increases customer traffic is by offering free movie trailers on its website.

After Christopherson watched some, movie ads started appearing on her Facebook page. The reason, according to the complaint, is a program called Meta Pixel, which Cinema Entertainment had installed several years earlier. It allegedly tracked her activity on the company's website and shared it with Meta, which then sent her targeted ads.

Her theory is that, as a "video tape service provider," Cinema Entertainment had a statutory obligation not to "knowingly disclose[], to any person, [her] personally identifiable information." *Id.* Once it did, it owed her and other putative class members "liquidated damages . . . of $2,500" apiece. *Id.* § 2710(c)(2)(A); *see* Fed. R. Civ. P. 23(b)(3). Or so she believed.

Instead of certifying the class and allowing the case to proceed, the district court dismissed on the ground that Cinema Entertainment was not a "video tape service provider." 18 U.S.C. § 2710(b)(1). Missing were plausible allegations that it was "engaged in the business . . . of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." *Id.* § 2710(a)(4).

-2-

II.

"We review the grant of a motion to dismiss de novo." *Far E. Aluminium Works Co. v. Viracon, Inc.*, 27 F.4th 1361, 1364 (8th Cir. 2022). Like the district court, we must decide whether Christopherson's complaint "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (alteration in original) (citation omitted).

Under the Video Privacy Protection Act, "video tape service provider[s]" owe consumers a duty not to share "personally identifiable information," 18 U.S.C. § 2710(b)(1), which in this context refers to "specific video materials or services" they have "requested or obtained," *id.* § 2710(a)(3). The violation occurred, according to Christopherson, when she "requested or obtained" movie tickets and website trailers, which led to the release of personally identifiable information to Meta.

The issue is whether screening movies and providing free trailers turns Cinema Entertainment into a "video tape service provider." *Id.* § 2710(a)(4). Fortunately, the statute tells us who qualifies as one: "any person, engaged in the business . . . of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials."[2] *Id.* It should come as no surprise that Cinema Entertainment is not in the business of renting, selling, or delivering VHS or Betamax tapes, which are largely relics of the past. Rather, we must decide whether it is "engaged in the business" of providing movie screenings or web trailers and whether either counts as the "rental, sale, or delivery of . . . similar audio visual materials." *Id.*

---

[2]For that reason, we have no reason to hunt for the plain and ordinary meaning of "service provider." The statutory definition already gives us everything we need. *See Spire Mo., Inc. v. USIC Locating Servs., Inc.*, 11 F.4th 908, 911 (8th Cir. 2021) (observing that a "statutory definition . . . supplant[s]" the plain and ordinary meaning of a term).

-3-

A.

Cinema Entertainment's "business" is filling theaters. *Id.* Revenue comes from selling tickets, which then gets customers through the door to buy popcorn, snacks, and other concessions. The movies it shows drive its business, so we must decide whether putting them on the big screen counts as the "rental, sale, or delivery of . . . similar audio visual materials." *Id.* If it does, then it owes a duty to protect the personally identifiable information of its customers. *See id.* § 2710(b)(1).

Running a theater involves the "delivery" of movies to create "audio visual" experiences. *See Webster's Third New International Dictionary* 143 (1986) (defining "audio visual" as involving "hearing and sight"). And the same movies shown at theaters were, at the time Congress passed the statute in 1988, later available on VHS and Betamax video cassettes. Christopherson believes that these overlapping attributes place theaters squarely within the definition of "video tape service providers." In her view, it makes no difference that they never used prerecorded video cassette tapes to screen movies.

The problem with her theory is what surrounds "audio visual" in the definition: "similar" and "materials." 18 U.S.C. § 2710(a)(4). The word "similar" means "nearly corresponding; resembling in many respects; somewhat alike; having a general likeness." *United States v. Mitchell*, 941 F.2d 690, 691 (8th Cir. 1991) (citation and brackets omitted); *accord Webster's Third*, *supra*, at 2120 (defining "similar" as "having characteristics in common: very much alike"). When used in a catch-all phrase like this one, meant to capture other objects "having a general likeness" to one or more specific items in a list, *Mitchell*, 941 F.2d at 691, it triggers "the interpretive principle known as ejusdem generis," *Designworks Homes, Inc. v. Columbia House of Brokers Realty, Inc.*, 9 F.4th 803, 809 (8th Cir. 2021) (emphasis omitted). Latin for "of the same kind," it requires us to construe "general words . . . to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Wash. State Dep't of Soc. & Health Servs. v. Guardianship Est. of Keffeler*, 537 U.S. 371, 384 (2003) (citation omitted). Here,

we must interpret "audio visual materials" by reference to the item that precedes it, "prerecorded video cassette tapes." *See Sw. Airlines, Co. v. Saxon*, 596 U.S. 450, 458 (2022).

The word "similar" does not stand alone. Immediately after "audio visual" is the word "materials." "Materials" like prerecorded video cassette tapes have a physical existence. *Webster's Third*, *supra*, at 1392 (defining "material" as "of, relating to, or consisting of matter"). As a basis for comparison, video cassettes have several attributes owing to their physical existence: they can be touched; played on a home recorder; watched, rewatched, paused, rewound, and fast forwarded; and shared with family and friends.

Contrast them with the theater experience. Movies underpin both, but the similarities end there. Going to a theater provides only a ticket, a license to sit in a seat to watch a particular movie. The customer has no control from there: the movie plays from start to finish with no opportunity to pause, rewind, or fast forward. For a repeat experience, the customer must buy another ticket and come back a second time, which contrasts sharply with the rewatchability of video cassettes. Perhaps the closest movie-theater analogy would be the reels or digital files used to screen the movies, but Cinema Entertainment is not "engaged in the business . . . of rent[ing], [selling], or deliver[ing]" them. 18 U.S.C. § 2710(a)(4); *see Osheske v. Silver Cinemas Acquisition Co.*, 132 F.4th 1110, 1113 (9th Cir. 2025) (reaching the same conclusion because a "theater patron[']s" experience does not "involv[e] an *exchange* of video materials" for money (emphasis added)). Movie theaters may "deliver[]" *movies*, but not the "*materials*" necessary to watch them. 18 U.S.C. § 2710(a)(4) (emphasis added); *see Osheske*, 132 F.4th at 1113.

If Congress had something else in mind, it could have said so. *See Rosewell v. LaSalle Nat'l Bank*, 450 U.S. 503, 523–24 (1981) (noting that "one would expect to find some mention of" an "expansive" category that "Congress knew" about at the time of enactment). When it passed the statute, the United States had more than 20,000 movie theaters in cities and towns across the country. It would have been

easy to add movie theaters. *See, e.g.*, 17 U.S.C. § 101 (defining a "motion picture exhibition facility" as "a movie theater, screening room, or other venue that is being used primarily for the exhibition of a copyrighted motion picture"). The fact that it did not suggests that "rent[ing], [selling], or deliver[ing] . . . similar audio visual materials"[3] is not what movie theaters do. *See Kucana v. Holder*, 558 U.S. 233, 247 (2010); *see also T-Mobile S. LLC v. City of Roswell*, 574 U.S. 293, 307 (2016) ("Congress could adopt such a rule if it were so inclined, but it did not do so in this statute. It is not our place to legislate another approach.").

## B.

The online movie trailers present a different problem for Christopherson. Even if we were to assume making them available on its website counts as the "delivery of . . . similar audio visual materials," Cinema Entertainment must be "engaged in the business" of providing them. 18 U.S.C. § 2710(a)(4). Only then would it potentially be liable under the Video Privacy Protection Act for sharing the information it collected about Christopherson.

Here, Congress provided definitions for several words and phrases, but "engaged in the business of" is not one of them. "In the absence of a statutory definition . . . , statutory terms are given their plain, ordinary, and commonly understood meaning," usually by "turn[ing] to a commonly used dictionary." *Schumacher v. Cargill Meat Sols. Corp.*, 515 F.3d 867, 871 (8th Cir. 2008). The word "engage" means "to begin and carry on an enterprise, esp[ecially] a business or profession." *Webster's Third*, *supra*, at 751. A "business," the other key word,

_____

[3]It means little that courts have sometimes given an expansive meaning to phrases like "audio visual materials" in other statutes. *See, e.g.*, *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 449 (1984) (mentioning "motion pictures and other audiovisual works" in the Copyright Act, 17 U.S.C. § 102 (a)); *McGann v. Cinemark USA, Inc.*, 873 F.3d 218, 223 (3d Cir. 2017) (considering "visually delivered materials" in the Americans with Disabilities Act, 42 U.S.C. § 12103(1)(B)). Unlike this one, none of those require "similar[ity]" with "prerecorded video cassette tapes." 18 U.S.C. § 2710(a)(4).

refers to "transactions, dealings, or intercourse." *Id.* at 302. Together, "to be engaged 'in the business' of something generally means to be regularly engaged in it for livelihood or gain." *Fox v. Amazon.com, Inc.*, 930 F.3d 415, 422 (6th Cir. 2019) (quoting *Black's Law Dictionary* (4th ed. 1968)). Courts have recognized that a company can be engaged in multiple businesses at the same time. *See Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533, 548 (2d Cir. 2024); *see also Snyder v. Comm'r*, 295 U.S. 134, 138 (1935) (explaining that, for tax purposes, a person "may be engaged in more than one trade or business").

For Cinema Entertainment, its business is selling movie tickets and concessions. If it is "engaged" in more than one business, movie exhibition and food service are the two it does for "livelihood or gain." *Fox*, 930 F.3d at 422. A web trailer, on the other hand, is a type of advertisement, a way to get potential customers in the seats by generating interest and anticipation for a film. By itself, however, it does not involve a "transaction[], dealing[], or intercourse," *Webster's Third*, *supra*, at 302, nor does the company provide them for "livelihood or gain," *Fox*, 930 F.3d at 422.

Consider the role advertisements play in other well-known industries. McDonald's, among the most iconic of American companies, spends millions a year on print, television, radio, and online advertising. But if one were to ask what "business" it is "engaged in," *see Salazar*, 118 F.4th at 548, any response would likely focus on selling hamburgers and other fast food. No one would say it is "engaged in the business of" advertising or making commercials. *See In re Vizio, Inc., Consumer Privacy Litig.*, 238 F. Supp. 3d 1204, 1221 (C.D. Cal. 2017) (explaining that letter carriers physically "deliver" videotapes to consumers, but no one would mistake them for "video tape service providers"); *see also Bartenwerfer v. Buckley*, 598 U.S. 69, 75 (2023) (equating "plain and ordinary meaning" with what "an ordinary English speaker would understand [a] sentence to mean").

The same is true of movie theaters. "[A]n ordinary English speaker," *id.*, would say they are "engaged in the business" of selling tickets, screening movies,

and perhaps offering concessions like popcorn and candy, not posting free movie trailers on their websites, 18 U.S.C. § 2710(a)(4). If they were, any business that posts video-based advertisements on its website, including McDonald's, *could* qualify as a "video tape service provider" based on the "delivery of . . . similar audio visual materials." *Id.* No one, not even Christopherson, thinks the Video Privacy Protection Act stretches so far.[4] *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress, we have held, does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes.").

III.

We accordingly affirm the judgment of the district court.

_____

---

[4]Christopherson asks us to construe it "broadly" in favor of liability because it is "remedial in nature." *Townsend v. Bayer Corp.*, 774 F.3d 446, 459 (8th Cir. 2014). Even if it is, "our analysis need go no further" than "the plain language" of an "unambiguous" statute. *Id.* (citation omitted). We will not "stretch" the text to support an interpretation "well beyond what [it] can naturally bear," remedial or not. *Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 51 (2008).