NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0366n.06

Nos. 22-1631/22-1641/22-1679

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

<table>
<tr><td>

ALTICOR GLOBAL HOLDINGS INCORPORATED; ALTICOR, INC.; AMWAY CORPORATION; AMWAY INTERNATIONAL, INCORPORATED,

  Plaintiffs-Appellees (22-1631),
  Plaintiffs-Appellants/Cross-Appellees (22-1641/1679),

   v.

AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE CO., nka AIG Specialty Insurance Company,

  Defendant-Appellant (22-1631),

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA,

  Defendant-Appellee/Cross-Appellant (22-1641/1679).

</td><td>

**FILED**
Aug 23, 2024
KELLY L. STEPHENS, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN

OPINION

</td></tr>
</table>

Before: GRIFFIN, NALBANDIAN, and MATHIS, Circuit Judges.

GRIFFIN, J., delivered the opinion of the court in which MATHIS, J., joined in full, and NALBANDIAN, J., joined in all but Section II.C. NALBANDIAN, J. (pp 22–29), delivered a separate opinion concurring in part and dissenting in part.

GRIFFIN, Circuit Judge.

In this insurance-coverage dispute, the district court concluded defendant American International Specialty Lines Company breached its insurance agreement with plaintiff Amway[1] when it declined to defend and indemnify Amway in underlying copyright-infringement litigation

---

[1]We refer to plaintiffs as "Amway"—plaintiff Alticor Global Holdings is a holding company, and the other plaintiffs are its subsidiaries.

that Amway ultimately settled. The district court then entered judgment against American for $36,923,844.50, which represented Amway's costs along with prejudgment interest. American raises four issues on appeal, three related to the district court's liability holdings and one regarding its imposition of prejudgment interest. We affirm and dismiss as moot the conditional appeal and cross-appeal concerning defendant National Union Fire Insurance Company of Pittsburgh, PA.

## I.

## A.

Amway is one of the largest direct-sales ventures in the world, selling numerous household products through independent contractors known as Independent Business Owners (IBOs). Defendants are insurance companies from whom Amway purchased insurance—American provided Amway with an Internet and network security insurance policy and National was Amway's umbrella carrier. Amway also purchased general liability insurance structured as "fronting insurance" from non-party ACE, which we detail later.

In 1996, twelve record companies sued Amway and many of its IBOs for copyright infringement in the Middle District of Florida. They accused Amway's IBOs of producing videotapes that utilized sound recordings without their consent, which were then used privately by IBOs "as motivational tools, as sales tools, to recruit new [IBOs,] and to promote upcoming Amway [IBO] conventions and conferences." The record companies sought to hold the IBOs liable for direct infringement and Amway liable under vicarious and contributory liability theories. This so-called VHS tape litigation settled in 1998. As part of the settlement terms, the parties agreed to an alternative-dispute-resolution process that set forth how they would address any future copyright violations.

Fast forward fourteen years to 2012. Several record companies once again accused Amway of engaging in copyright infringement; this time, however, the alleged infringing act was not that of producing VHS recordings to be used internally but uploading videos to the Internet for the entire world to see. Their letter identified "more than 365 infringing videos containing more than 220 different sound recordings" and asserted Amway's history showed its conduct was willful, highlighting that "approximately 25 of the videos (containing at least ten different sound recordings) incorporate sound recordings that also were at issue in the previous lawsuit." It also directly linked Amway to the videos in a manner distinct from the VHS tape litigation:

> It also is clear that at the direction and instruction of Amway Corporation, the Internet has to a large extent significantly enhanced the marketing and advertising practices that were the subject of the previous lawsuit. Thus, *instead of using our . . . music in videos that were only performed or distributed internally, these infringing videos are now made available to anyone in the world with access to a computer, tablet or smartphone as part of an ongoing video marketing program involving Amway and its distributors*.

(Emphasis Added). The letter additionally asserted Amway's conduct violated the permanent injunction and final judgment agreed to in the VHS tape litigation, and it expressly put Amway on notice of the record companies' intent to invoke the alternative dispute resolution provision set forth in the settlement agreement. Amway tendered the letter to American, National, and ACE, triggering each carrier's evaluation of whether coverage would lie under their respective policies.

The American policy provided insurance coverage and indemnity up to $25 million for claims alleging wrongful acts—including copyright infringement—on Internet media. American eventually denied coverage under this policy. Although it noted three reasons for doing so, two exclusion provisions—which both relate to the VHS tape litigation—are relevant here. Exclusions J and P generally preclude coverage for prior litigation or those claims with prior notice, respectively. American generally claimed that it was not obligated to defend against this "Internet

video litigation" because, in its view, those claims were just repackaged violations flowing from the VHS tape litigation.

The two other policies merit brief mention. Amway's policy with National provided $50 million in umbrella coverage for personal and advertising injury per occurrence, which applied "only in the excess of . . . Underlying Insurance and any applicable Other Insurance whether or not such limits are collectible." National issued several reservation-of-rights letters to Amway, and it takes the position that its policy does not provide coverage.

The ACE policies are more complicated. Amway annually purchased commercial general liability coverage from ACE between 2006 and 2016, which provided up to $2 million in coverage per occurrence for "personal and advertising injury liability" (which includes copyright infringement), up to $4 million in the aggregate. What is peculiar about the ACE policies is that the deductible matches the policy limits; as all parties agree, this means that they are "fronting" policies. This structuring is important—one of American's main arguments on appeal is that these policies constitute "other valid and collectible insurance available to [Amway]" under its policy, which must be satisfied first. ACE admits the letter's allegations "trigger[ed] coverage," but, like National, issued a reservation of rights.

Amway's dispute with the record companies eventually made its way to federal court when Amway sued the record companies in 2014 in the Middle District of Florida for breach of the settlement agreement, tortious interference with contractual rights, and civil conspiracy. The defendants and other record companies counterclaimed with their own copyright-infringement (and similar tort) claims in 2015.

Three of the record companies—UMG, Capitol, and Sony, each a party to the VHS tape litigation—also asserted their own breach-of-settlement-agreement counterclaim. That

counterclaim has some import, for Count IX of the record companies' counterclaim alleged that Amway breached the alternative-dispute-resolution provision of the settlement agreement that resolved the VHS tape litigation. The parties eventually settled the Internet video litigation with Amway paying $7,562,500 to the record companies.

B.

Having incurred millions of dollars in defense and settlement costs in its dispute with the record companies in the Internet video litigation, Amway commenced this breach-of-contract litigation against American and National. The district court issued three orders—on cross-motions for summary judgment—that are relevant to this appeal.

*First*, the district court's "Phase One Order" concluded that the record companies' 2015 counterclaim triggered American's duty to defend, and that Exclusions J and P did not permit American to deny coverage. *Second*, the district court's "Phase Two Order" held that Amway's "fronting insurance" policies through ACE did not constitute "other valid and collectible insurance available to [Amway]" that must be exhausted before American's obligations are triggered. It further held that American was obligated to pay the actual defense and indemnity costs (including the settlement value)—totaling $23,576,382.41—Amway incurred defending against the record companies' claims because American waived its right to challenge the reasonableness of the actual defense costs. And *third*, the district court concluded in one of its final orders that Amway was entitled to recover $13,347,462.18 in prejudgment interest. As for National, the district court declined to determine the scope of National's coverage because American, as the primary insurer, was liable for an amount less than the policy limit, and therefore, the question of National's excess umbrella-coverage obligations was moot.

The district court ultimately entered judgment against American for $36,923,844.50 in Amway's favor as follows: (1) $16,013,882.41 to reimburse Amway's defense costs; (2) interest under Mich. Comp. Laws § 600.6013 and § 500.2006 on the defense cost award, amounting to $9,066,051.13; (3) $7,562,500 to indemnify Amway for the amounts it paid to resolve its disputes with the Record Companies; and (4) interest under § 600.6013 and § 500.2006 on the indemnity award, amounting to $4,281,410.96. Given its liability findings against American, the district court dismissed Amway's claims against National with prejudice. American appeals in No. 22-1631, Amway contingently appeals in No. 22-1641, and National conditionally cross-appeals in No. 22-1679.

## II.

## A.

The first three issues on appeal relate to American's liability and arise from the district court's grant of summary judgment in Amway's favor. We review de novo a district court's resolution of cross-motions for summary judgment. *Snyder v. Finley & Co., L.P.A.*, 37 F.4th 384, 387 (6th Cir. 2022). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The moving party bears the burden of showing that no genuine issues of material fact exist." *Rafferty v. Trumbull Cnty.*, 915 F.3d 1087, 1093 (6th Cir. 2019). All reasonable inferences will be drawn in favor of the non-moving party. *Mutchler v. Dunlap Mem'l Hosp.*, 485 F.3d 854, 857 (6th Cir. 2007).

This appeal turns on a legal issue: the interpretation of an insurance policy under Michigan law. Michigan courts "construe an insurance policy in the same manner as any other species of contract." *DeFrain v. State Farm Mut. Auto. Ins. Co.*, 817 N.W.2d 504, 509 (Mich. 2012). In

doing so, Michigan courts "look[] to the contract as a whole." *Auto-Owners Ins. Co. v. Harrington*, 565 N.W.2d 839, 841 (Mich. 1997). If the insurance contract sets forth definitions, the policy language must be interpreted according to those definitions. *Allstate Ins. Co. v. Freeman*, 443 N.W.2d 734, 739 (Mich. 1989). But if not, "reviewing courts must interpret the terms of the contract in accordance with their commonly used meanings." *Henderson v. State Farm Fire and Cas. Co.*, 596 N.W.2d 190, 194 (Mich. 1999). If a contract is unambiguous, it is "not open to judicial construction and must be enforced as written." *Rory v. Cont'l Ins. Co.*, 703 N.W.2d 23, 30 (Mich. 2005) (emphasis omitted).

On appeal, American focuses on three issues concerning liability: (1) whether Exclusions J and P barred coverage; (2) whether Amway's "fronting insurance" policies through ACE constituted "other valid and collectible insurance available to" Amway that must be exhausted before American's obligations were triggered; and (3) whether genuine disputes of material fact existed concerning indemnification for the entire settlement amount. We address these contentions in turn.

## B.

"Interpretation of an insurance policy ultimately requires a two-step inquiry: first, a determination of coverage according to the general insurance agreement and, second, a decision regarding whether an exclusion applies to negate coverage." *Harrington*, 565 N.W.2d at 841. We can skip to the latter question because American does not dispute that the Internet video litigation qualifies for coverage in the first place. Rather, American contends Exclusions J and P—which each operate independently but turn on the VHS tape litigation—excused it from having to comply with its broad duty to defend. The district court disagreed with American, and we do as well.

### 1.

Under Michigan law, "[i]f the allegations of a third party against the policyholder even arguably come within the policy coverage, the insurer must provide a defense." *Am. Bumper & Mfg. Co. v. Hartford Fire Ins. Co.*, 550 N.W.2d 475, 481 (Mich. 1996). An insurer's duty to defend is triggered "even where the claim may be groundless or frivolous." *Id.*; *see also Protective Nat'l Ins. Co. of Omaha v. City of Woodhaven*, 476 N.W.2d 374, 376 (Mich. 1991) ("An insurer has a duty to defend, despite theories of liability asserted against any insured which are not covered under the policy, if there are any theories of recovery that fall within the policy." (citation omitted)). However, "coverage under a policy is lost if any exclusion within the policy applies to an insured's particular claims." *Auto-Owners Ins. Co. v. Churchman*, 489 N.W.2d 431, 434 (Mich. 1992). "Exclusionary clauses in insurance policies are strictly construed in favor of the insured." *Id.* But "clear and specific exclusions must be enforced" because "it is impossible to hold an insurance company liable for a risk it did not assume." *Hunt v. Drielick*, 852 N.W.2d 562, 566 (Mich. 2015) (brackets and citations omitted). We construe contractual ambiguity in favor of the insured, *Citizens Ins. v. Pro-Seal Serv. Grp., Inc.*, 730 N.W.2d 682, 686 (Mich. 2007), and the insurer bears the burden of proving the absence of coverage, *Hunt*, 852 N.W.2d at 565.

2.

American contends two subparts of Exclusion J independently bar coverage, "Clause 1" and "Clause 2."

a.

We begin with Clause 1. It provides: American "will not cover claims . . . alleging, arising out of or resulting, directly or indirectly, from . . . any claim . . . prior to or pending as of" March 1, 2002. American contends the claims at issue in the Internet video litigation allege, arise

out of, or result from the VHS tape litigation—i.e., a claim made prior to March 1, 2002—and are thus excluded from coverage.

We focus here on "arising out of" and "resulting from."[2] The former has "a relatively well-established meaning in insurance law"—"some sort of causal connection" is required, i.e., one that is "more than incidental, fortuitous, or 'but for.'" *Thornton v. Allstate Ins. Co.*, 391 N.W.2d 320, 323, 327 (Mich. 1986). In a different context, the Michigan Supreme Court has given that phrase a universal meaning: "Something that 'arises out of,' or springs from or results from something else, has a connective relationship, a cause and effect relationship, of more than an incidental sort with the event out of which it has arisen." *People v. Johnson*, 712 N.W.2d 703, 706 (Mich. 2006) (brackets omitted); *see also People v. Warren*, 615 N.W.2d 691, 697 n.23 (Mich. 2000) (favorably citing cases "interpreting the phrase 'arising out of' in insurance contracts [that] found the phrase to have a broad, comprehensive, and general meaning synonymous with the phrase 'grows out of,' as well as the phrases 'originating from,' 'having its origin in,' or 'flowing from'"). "Resulting from" has a similar but more specific meaning—it is tied to a consequence. *See, e.g.*, *Robinson v. City of Detroit*, 613 N.W.2d 307, 316 (Mich. 2000).

Given the breadth of American's duty-to-defend obligation and Michigan law's mandate that we strictly construe exclusions in favor of Amway, the district court appropriately rejected American's attempt to causally connect the Internet video litigation to the VHS tape litigation. It correctly noted that the two involved "different technology, different time periods, different copyrighted works, and different IBOs." Most importantly, the two lawsuits alleged different

---

[2]In district court, American made no argument concerning "alleging." This failure renders American's appellate arguments concerning "alleging" forfeited. *See Thomas M. Cooley L. Sch. v. Kruzon Strauss, LLP*, 759 F.3d 522, 528 (6th Cir. 2014).

schemes of infringement: the materials marketed in the VHS tape litigation were internal and prepared by IBOs, while those at issue here were coordinated by Amway and uploaded for public consumption. Recall that American insured Amway for Internet media exposure. The VHS tape litigation, a claim advanced during the Internet's infancy in 1996, was unrelated to the Internet. To say that the Internet claim here "sprang" from, *Johnson*, 712 N.W.2d at 706, or was a consequence of that litigation, *Robinson*, 613 N.W.2d at 316, stretches the policy's language too far. Just because Amway allegedly did a similar thing in the past with different technology does not establish a causal link.

American says otherwise, pointing to the record companies' breach-of-settlement-agreement counterclaim. But there is a difference between a "claim" (the VHS tape litigation) and how the parties *resolved* that claim (the alternative-dispute-resolution provision in the parties' settlement agreement). That both the record companies and Amway brought breach-of-settlement-agreement claims in the Internet Video litigation does not create a causal link to the copyright-infringement claims at issue in the VHS tape litigation. Indeed, the record companies admitted that the settlement agreement "*did not resolve any future claims* such as the ones alleged" in their counterclaim. (Emphasis Added). To hold otherwise, moreover, would collapse the distinction between an insurer's broad duty to defend and its narrower duty to indemnify. *See, e.g.*, *Am. Bumper*, 550 N.W.2d at 481 (discussing the differences).

For these reasons, American cannot rely on Clause 1 of Exclusion J to overcome its duty to defend.

b.

American separately points to what it calls Exclusion J's "Clause 2." It provides: American "will not cover claims . . . alleging or arising out of or relating to any fact, circumstance,

situation or wrongful act alleged in [any] claim" covered by "Clause 1." The focus here is "relating," which "ordinarily means being 'associated' or 'connected.'" *DaimlerChrysler Corp. v. G Tech Pro. Staffing, Inc.*, 678 N.W.2d 647, 650 (Mich. Ct. App. 2003) (per curiam) (citation omitted). That is, there must be a "logical association or development to make a connection between two events." *Id.* (citation, emphasis, and ellipsis omitted).

American largely reiterates its "Clause 1" arguments again here. In its view, that Amway allegedly participated in copyright infringement in the VHS tape litigation demonstrates a connection to the Internet video litigation given the latter's allegations of Amway's "history of recidivism" and Amway's infringement being a "repeat performance." And, relying on *Realcomp II, Ltd. v. ACE American Insurance Company*, 46 F. Supp. 3d 738 (E.D. Mich. 2014), American argues there need not be the same conduct to count as "relating"; similarity is enough. In short, the claim is "related" because "Amway's alleged actions resulted in infringements."

For those reasons discussed above, this broad assertion is again unpersuasive. The district court appropriately distinguished the two lawsuits and found no relationship sufficient to make this exclusion applicable. Again, given the strict nature by which we must view exclusions under Michigan law, the district court correctly rejected American's position here.

3.

Finally, American points to Exclusion P as separately barring coverage. It provides: American "will not cover claims . . . arising out of or resulting, directly or indirectly, from . . . any circumstance or occurrence . . . alleging the same or similar facts, alleged or contained in any claim that has been reported [prior to the inception date of this policy]." In American's view, the "similar facts alleged" language excludes coverage due to the factual overlap between those claims asserted in the VHS tape litigation and the Internet video litigation. For reasons like those rejected

regarding Exclusion J, given the requirements of "arising out of or resulting from" and Michigan's construction rules for insurance exclusions—that they must be "strictly construed in favor of the insured," *Churchman*, 489 N.W.2d at 434—we are not convinced.

4.

For these reasons, the district court correctly concluded neither Exclusion J nor P barred coverage.

C.

The second issue on appeal is whether the policy's "other insurance" provision means that Amway's "fronting insurance" with ACE took priority over American's. Preliminarily, we note that in this litigation, ACE is not a party, did not seek to intervene, and did not file an amicus brief.

"'Other insurance' clauses are provisions inserted in insurance policies to vary or limit the insurer's liability when additional insurance coverage can be established to cover the same loss." *St. Paul Fire & Marine Ins. Co. v. Am. Home Assur. Co.*, 514 N.W.2d 113, 115 (Mich. 1994). The one at issue here is an excess clause, which "limits the insurer's liability to the amount of loss in excess of the coverage provided by the other insurance." *Id.* The policy's specific language provides that "such insurance as is provided by this policy shall be excess of any other valid and collectible insurance available to you."

Key to this issue is how the ACE policies are structured. No one disputes that ACE provided general liability coverage to Amway and that if it were the "usual" kind of general liability policy, it would take priority over American's insurance by operation of the "other insurance" clause. But recall that the ACE policies are peculiar, with the deductible matching the policy limits. This means they are "fronting policies." "Fronting is the use of an insurer to issue paper—that is, an insurance policy—on behalf of a self-insured organization without the intention

of bearing any of the risk." *Corwin v. DaimlerChrysler Ins. Co.*, 819 N.W.2d 68, 72 n.3 (Mich.

Ct. App. 2012) (alterations and internal quotation marks omitted). Or, as we have described:

> The term "fronting" refers to situations in which "the business pays a greatly discounted premium to an insurance company with insurance licensing and filing capabilities in particular states" in exchange for "an insurance policy that complies with the financial-responsibility laws of each state in which the business is required to maintain proof of financial responsibility." Practically speaking, the business "is renting an insurance company's licensing and filing capabilities," which is often economically advantageous for the business. In typical fronting policies, the deductible matches the limit of liability, such that the business bears the entire risk of loss.

*White v. Ins. Co. of Pa.*, 405 F.3d 455, 457 (6th Cir. 2005) (internal citations omitted).

Resolution of this issue turns on whether the ACE policies constituted "collectible

insurance available to [Amway]," as all parties agree the ACE policies were valid. Because the

Michigan Supreme Court has not addressed the interpretation of such policy language, our task is

to make an "*Erie* guess" as to how it would rule. *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 577 (6th

Cir. 2004); *see also Erie R. Co. v. Tompkins*, 304 U.S. 64, 78–80 (1938).

Under Michigan insurance law, "the term 'available' is ambiguous," and, "when construed

in favor of the insured," means "actually available or accessible, or that which is reasonably

available, as opposed to that which is theoretically or hypothetically available." *Auto-Owners Ins.

Co. v. Leefers*, 512 N.W.2d 324, 326–27 (Mich. Ct. App. 1993) (some internal quotation marks

omitted). And as the district court ably explained, the ACE policies at best present hypothetical

availability, for their fronting nature inherently means Amway cannot collect insurance proceeds

from ACE:

> Amway bears responsibility for all the costs under the ACE Policies. The Policies are only theoretically or hypothetically available since they allow Amway to essentially rent an insurance company's licensing and filing capabilities. Furthermore, the deductible matches the coverage limit, and Amway must either

reimburse ACE for any money spent under the Policies or ACE assumes no responsibility to pay defense or indemnity costs.

(Internal Quotation Marks, Citation, and Brackets Omitted). This reasoning comports with the only other court of which we are aware to have addressed the exact policy language here. *See Scottsdale Ins. Co. v. United Rentals (N. Am.), Inc.*, 977 F.3d 69, 73, 75 (1st Cir. 2020) (concluding fronting insurance was not "valid and collectible insurance" because, "in any scenario under which ACE would pay out under the policy, [the insured] would still be obligated to pay ACE back for any money spent").[3] Simply, the ACE policies were not collectible *to Amway*.

American resists this conclusion by pointing to several cases arising out of Michigan's no-fault automobile insurance system. *See, e.g.*, *Jarrad v. Integon Nat'l Ins. Co.*, 696 N.W.2d 621 (Mich. 2005); *Allstate Ins. Co. v. Elassal*, 512 N.W.2d 856 (Mich. Ct. App. 1994) (per curiam). True, those cases suggest that "self-insurance . . . is the functional equivalent of a commercial no-fault insurance policy." *Jarrad*, 696 N.W.2d at 627; *id.* at 622 (holding that a "self-funded long-term disability plan constitutes 'other health and accident coverage' that is subject to coordination" of benefits under Michigan's no-fault law); *Allstate*, 512 N.W.2d at 859 ("We conclude that because self-insurance is the functional equivalent of insurance under the no-fault and financial responsibility acts, Enterprise's agreement to indemnify its renters against third-party claims was 'other collectible insurance' within the meaning of Allstate's policy terms."). But unlike the policies in those cases, American's policy here is concerned with whether "other valid and collectible insurance" is "*available* to [Amway]." Such language is incompatible with self-

---

[3]Amway separately asserts American forfeited this "other insurance" issue because it failed to raise this issue in its denial letters. *See, e.g.*, *Kirschner v. Process Design Assocs.*, *Inc.*, 592 N.W.2d 707, 709 (Mich. 1999). But given our substantive conclusion in Amway's favor on this issue, we need not address Amway's procedural argument.

insurance. That language also distinguishes American's other main cases, *Continental Casualty Co. v. National Union Fire Insurance Co. of Pittsburgh*, 812 F.3d 1147, 1151 (8th Cir. 2016) and *Air Liquide America Corp. v. Continental Casualty Co.*, 217 F.3d 1272 (10th Cir. 2000).

D.

American's final liability-related issue concerns the district court's holding that American breached its indemnity duty and thus was liable for Amway's $7,562,500 in settlement costs arising out of the Internet video litigation.

Under Michigan law, when an insurer wrongly refuses to defend an insured, the insurer is "bound to pay the amount of any reasonable, good faith settlement made by the insured in the action brought against him by the injured party." *Detroit Edison Co. v. Mich. Mut. Ins. Co.*, 301 N.W.2d 832, 836 (Mich. Ct. App. 1981). Moreover, "[t]he settlement is presumptive evidence that there was a liability, and as to the amount thereof," so that the insured "may recover the amount paid on such settlement, unless it is shown that there was in fact no liability, or that the amount paid was excessive." *Id.* (citation omitted). American does not dispute the settlement's reasonableness but claims that there existed triable issues of fact concerning whether the videos at issue in the Internet video litigation were actually created by Amway and therefore fall outside the policy's indemnity scope.[4] We are not persuaded.

The applicable language for this issue is set forth in two parts in the policy. First, the policy states that American "shall pay on your behalf those amounts . . . you are legally obligated to

---

[4]American also asserts that we should reverse the grant of summary judgment in Amway's favor "with directions for the district court to consider Exclusions J and P with respect to indemnity." But having failed to argue below that the district court was required to divide settlement liability through the lens of those two exclusions, American forfeited this argument. *Potter v. Comm'r of Soc. Sec.*, 9 F.4th 369, 381 (6th Cir. 2021).

pay . . . as damages resulting from any claim(s) made against you for your wrongful act(s) in the display of Internet media." Second, the policy's definitions section subpart CCC sets forth the meaning of "you" and "your" as:

(1) the named insured;

(2) any subsidiary of the named insured, but only with respect to wrongful acts, extortion claims, failures of security, criminal reward funds, crisis events or loss that occur while it is a subsidiary and is otherwise covered by this policy;

\* \* \*

(4) . . . *any agent or independent contractor*, including distributors, licensees and sub-licensees, in their provision of material for Internet media *on behalf of or at the direction of the named insured* . . . .

(Emphases Added).

American focuses on the definition of "you." In its view, save six videos that "were possibly created by 'Amway,'" the remainder of the videos at issue in the Internet video litigation were created by Amway's IBOs. And although IBOs may constitute "agent[s] or independent contractor[s]," American asserts there is a fact dispute concerning whether the IBOs created the videos "on behalf of or at the direction of" Amway. That is, according to American, a jury should decide which part of the $7,562,500 settlement should be apportioned to Amway (and thus recoverable against American).

But Amway persuasively responds with the policy language—American is required to pay "damages resulting from any *claim(s) made against you for your wrongful act(s)*."[5] (Emphasis

---

[5]Amway asserts that American forfeited this issue because it failed to adequately brief the antecedent question: whether "an insurer is entitled to allocate a settlement payment where it refused to participate in the defense of the underlying claims." [Amway Br., 65-66]. We do not agree—American's argument is not based on whether allocation is permissible under Michigan insurance law; rather, it is that the policy carves out indemnity for acts outside of Amway's control.

Added). The claim made in the counterclaim was that Amway wholly controlled the posting of those videos. Here are just some relevant portions of the counterclaim that directly tie Amway to the "on behalf of or at the direction of" portion of the policy's definition for agents/independent contractors:

> 2.    [T]he Record Companies have identified . . . more than 1,100 separately uploaded videos, distributed, or publicly performed by Amway itself, its affiliated entities, *and those it controls* within its multi-level marketing empire.

> 4.    According to Amway's rules, Amway had the absolute *right to review and approve* the content of all of the infringing videos before they were posted online and made public.

> 54.    Amway . . . *directed its IBOs to migrate infringement to the Internet*.

(Emphasis Added).

American does not dispute that the record companies alleged in the counterclaim that Amway directly controlled the infringement scheme but instead asserts we should focus on Amway's asserted defense to that claim. Amway denied that it exerted the level of control over its IBOs as alleged by the record companies. But American's problem is that the plain language of the policy's indemnification provision focuses on the claim made against Amway, not Amway's asserted factual defense of that claim.

For these reasons, this claim of error is meritless.

### III.

The last issue on appeal deals not with liability but instead with just one narrow aspect of damages. American takes issue with the district court's determination that the proper end date for calculating prejudgment penalty interest on Amway's defense costs was February 7, 2022 (the date of its "Phase Two Order"). American argues that the district court should have stopped

prejudgment penalty interest instead on March 22, 2019, when the district court entered its "Phase One Order."

In diversity cases, as here, state law governs prejudgment interest and federal law governs post-judgment interest. *F.D.I.C. v. First Heights Bank, FSB*, 229 F.3d 528, 542 (6th Cir. 2000). Michigan law subjects an insurer who fails to timely pay a satisfactory proof of loss to a twelve percent interest penalty. Mich. Comp. Laws § 500.2006(1), (4). This interest runs until the triggering of the federal post-judgment interest statue, 28 U.S.C. § 1961. *See Stryker Corp. v. XL Ins. Am.*, 735 F.3d 349, 361 (6th Cir. 2012). That occurs when "the monetary damages have been meaningfully ascertained." *Adkins v. Asbestos Corp.*, 18 F.3d 1349, 1351 (6th Cir. 1994) (citing *Kaiser Alum. & Chem. Corp. v. Bonjorno*, 494 U.S. 827 (1990)). Put differently, this is "the date of the judgment that unconditionally entitles" a party to an award, even if the amount is not yet quantifiable. *Associated Gen. Contractors of Ohio, Inc. v. Drabik*, 250 F.3d 482, 485, 491–92 (6th Cir. 2001).

Before detailing why the district court selected February 7, 2022, as the end date, a procedural history refresher is in order. The district court resolved American (and National)'s liability issues in two relevant orders. The first, what the parties (and district court) dubbed the "Phase One Order," was issued on March 22, 2019. It addressed only two issues concerning American: "(1) Exclusions J and P of the [American] Policy do not as a matter of law preclude all coverage for the Internet Video Claim(s); [and] (2) The 2015 Counter-claim, and not the 2012 letter, is the trigger of [American]'s duty to defend under the [American] Policy." The order even contemplated that it was a "limited" one concerning the scope of American's coverage: "The parties all have other policy issues they have reserved for later stages of the litigation. The Court, in similar fashion, is ruling only on the limited issues addressed in this Opinion at this time." That

is, it "resolved the coverage issues that it believe[d could] be decided . . . as a matter of law" at

that time. It is this order that American says sets the prejudgment interest end date.

The other order, the "Phase Two Order," was issued on February 7, 2022. In the district

court's words, that order "build[s] upon" the Phase One Order and made several relevant holdings,

including: (1) "ACE is not 'Other Insurance,' and [American] bears the responsibility for the

indemnity and defense costs"; and (2) American waived its right to challenge the reasonableness

of the actual defense and settlement costs. Most importantly, it is in this order that the district

court expressly set forth American's liability:

> Amway is entitled on this record to an award of actual defense costs incurred in
> defending the Internet Video Claim. The Record Companies' counter-claim
> triggered [American]'s duty to defend, but [American] wrongfully declined to do
> so. [American] must reimburse Amway's actual defense costs, which are a
> reasonable measure of recoverable costs under applicable law. Moreover, there is
> no triable issue here on the reasonableness of the costs.

With that procedural background, and mindful that we review the district court's

calculation of prejudgment interest for abuse of discretion, *Ford v. Uniroyal Pension Plan*,

154 F.3d 613, 619 (6th Cir. 1998), we set forth the district court's reasoning for why it picked the

Phase Two Order date as the cutoff for prejudgment penalty interest:

> The penalty interest on the defense costs stopped accruing on February 7, 2022, the
> date of the Court's Phase Two Order. This is when [American]'s defense cost
> obligation was reasonably ascertained. . . . Again, post-judgment interest begins
> when damages were meaningfully ascertainable, which was with the Court's Phase
> Two Order. A "judgment" under 28 U.S.C. § 1961 does not have to be a final,
> appealable judgment or contain a penalty interest calculation.
>
> [American] argues that post-judgment interest began accruing with the earlier
> Phase One Order on March 22, 2019 since the Court then found that [American]'s
> duty to defend was triggered. However, a determination that [American] had a duty
> to defend Amway against the Counter-claim is not a determination of damages. In
> the Phase One Order, the Court had not yet resolved the extent of [American]'s
> obligation to reimburse Amway. It was not until the Phase Two Order that the
> Court addressed the damages issues, including: the Internet Video Claim

telescopes into the 2006-2007 [American] Policy; the ACE Policies are fronting insurance and not "Other Insurance" that must be exhausted first; [American] waived the right to challenge the reasonableness of the defense costs but did not waive the right to rely on its policy language for an effective trigger. With these rulings, damages were ascertainable. . . . *It is not the Phase One Order on the general coverage issues that controls, but rather the Phase Two Order that holds [American] responsible for all defense costs. The total defense costs were a known quantity by the date of the Phase One Order, but the particular amount for which [American] was responsible was not resolved until the Phase Two decision.* Thus, penalty interest for defense costs stopped accruing and post-judgment interest began accruing on February 7, 2022.

In sum, Amway is entitled to $9,066,051.12 in penalty interest on the defense costs, with an accrual period running from May 22, 2017 to February 7, 2022.

(Emphases Added).

On appeal, American focuses on the emphasized language in the district court's order to argue for an abuse of discretion. In American's view, "Amway's defense costs were fixed" after the Phase One Order; that is, all that was left to do was to calculate the award since liability was settled. So it characterizes the Phase Two Order as merely refining what those damages are—i.e., like a remittitur, *see Coal Res., Inc. v. Gulf & W. Indus., Inc.*, 954 F.2d 1263, 1275 (6th Cir. 1992), or a change in how to calculate the prejudgment interest rate, *see Caffey v. Unum Life Ins. Co.*, 302 F.3d 576, 590 (6th Cir. 2002).

American chiefly relies on our caselaw mentioning a lack of vacatur to make this argument. Consider, for example, *Stryker*. There, we affirmed the district court's choice of cutoff date for prejudgment interest—with interest terminating on the date of an earlier judgment granting prejudgment interest instead of on the date of a later-entered final amended judgment. *Stryker*, 735 F.3d at 361–62. We reasoned that prejudgment interest runs until the date of the entry of judgment, and that "judgment," in this context, includes "any judgment that is not entirely set aside." *Id.* at 361 (citation omitted). Because the later-issued final amended judgment did not

"completely vacate" the earlier-issued judgment, the date of that earlier one was the appropriate cutoff date. *Id.* at 361–62 (citation omitted).

But *Stryker* and like cases are distinguishable from the circumstances here because of what the district court decided in the Phase One Order and Phase Two Order. The Phase One Order was not a judgment—it was rather a limited determination on certain coverage issues. It was not until after the entry of the Phase Two Order that Amway was "unconditionally entitle[d]" to an award based on American's breach of contract. *Drabik*, 250 F.3d at 490. Thus, that latter order was an appropriate cutoff date for prejudgment interest. No abuse of discretion occurred here.

IV.

Finally, because we resolve American's appeal in Amway's favor, Amway's contingent appeal (No. 22-1641) and National's conditional cross-appeal (No. 22-1679)—as all parties agree—are moot.

V.

For these reasons, we affirm the district court's judgment in Amway's favor, and dismiss as moot the appeals in Nos. 22-1641 and 22-1679.

NALBANDIAN, Circuit Judge, concurring in part and dissenting in part. I agree with most of the majority's opinion. But I write to dissent from its holding that Amway's "fronting" insurance with ACE did not qualify under the American policy's "Other Insurance" clause. My review of the policy's text, Michigan cases, and other federal appellate opinions leads me to believe that the policies trigger the clause because they are valid insurance that Amway can collect from in the first instance. So I respectfully dissent as to Section II.C and would reverse on this ground.

**I.**

In this diversity case, we apply the substantive law of the forum state (Michigan) and are bound by "controlling decisions" by Michigan's Supreme Court. *Fox v. Amazon.com, Inc.*, 930 F.3d 415, 422 (6th Cir. 2019).[1] So far, no Michigan appellate court has decided whether similar "Other Insurance" clauses cover fronting policies like ACE's. So we must "predict" how the Michigan Supreme Court would rule. *Id.*

The majority opinion affirms the district court's holding that the American policy's "Other Insurance" clause is not triggered by Amway's General Liability policies with ACE, just because of their "fronting nature." Maj. Op. at 13 (citing R.253, D.Ct. Op. at 15, PageID 12431). I disagree.

**A.**

I start with the policy's text, as Michigan courts do. *City of Grosse Pointe Park v. Mich. Mun. Liab. & Prop. Pool*, 702 N.W.2d 106, 122 (Mich. 2005) ("[A] court must always begin with

---

[1] Published opinions of the Michigan Court of Appeals also have state-wide "precedential effect under the rule of stare decisis." Mich. Ct. R. 7.215(C)(2), (J)(1); *Rouch World, LLC v. Dep't of C.R.*, 987 N.W.2d 501, 508 (Mich. 2022); *Chase v. Macauley*, 971 F.3d 582, 587 (6th Cir. 2020).

the actual language used by the parties in the insurance policy itself."). Michigan courts "construe an insurance policy in the same manner as any other species of contract, giving its terms their ordinary and plain meaning." *DeFrain v. State Farm*, 817 N.W.2d 504, 509 (Mich. 2012) (cleaned up).

The "Other Insurance" clause here provides that American's insurance "shall be excess of any other valid and collectible insurance available to you [i.e., Amway]." R.71-7, American Policy at 19, PageID 3027. The majority concludes that the clause is not triggered by the ACE policies since their "fronting nature" means that "Amway bears responsibility for all the costs." Maj. Op. at 13 (quoting R.253, D.Ct. Op. at 15, PageID 12431).

I disagree based on an independent review of the policy's text. For one, the ACE policy is "valid insurance" under Michigan law—as the majority itself recognizes. Maj. Op. at 13 ("[A]ll parties agree the ACE policies were valid.").[2]

For two, ACE's fronting policies are "collectible insurance," since the record establishes that Amway can receive reimbursement under the policy. The district court aptly defined "collectible insurance" as "insurance [that] is able or required to reimburse the insured for covered losses." R.253, Op. at 14–15, PageID 12430–31. The ACE policies fit within this definition: the policies provide that ACE "will pay" Amway for expenses related to "personal and advertising injury" suits, R.235-3, ACE Policy at 6, PageID 11153, and ACE itself acknowledged coverage, R.235-11, ACE Coverage Position Letters. The majority opinion avoids the clause's plain import

---

[2] By Amway's own admission, "certificates of insurance" issued under the ACE policies enabled it to lease properties and engage in other commercial transactions requiring proof of insurance. R.235-6, Rutowski Dep. Tr. at 70-73, PageID 11457. *See also* Mich. Comp. Laws § 500.2271 ("A person shall not . . . [d]emand or require the issuance of a certificate of insurance . . . that contains any false or misleading information.").

by objecting that, as "fronting policies," "the ACE policies are peculiar, with the deductible matching the policy limits." Maj. Op. at 12. But however "peculiar" these policies may be, Amway may still collect payments from them in the first place, even if it must fully reimburse ACE—rendering the policies "collectible insurance." *Cf.* 15 *Couch on Insurance* 3d § 217:9 *Method of allocating loss generally* ("Any applicable deductible is relevant between the insurer and insured only, and does not apply to proration.").

Finally, the ACE insurance policies are "available to" Amway. Amway is the policy's beneficiary and may collect reimbursement for the copyright infringements alleged by the internet video litigation. *See* R.235-3, ACE Policy at 6, PageID 11153; R.235-11, ACE Coverage Position Letters. The majority says that the "available to you" "language is incompatible with self-insurance," Maj. Op. at 14–15, but I am unpersuaded. Although the majority treats this as a separate requirement, it largely collapses into whether the ACE policies are "collectible" by Amway. If Amway can collect on the policies, the policies are plainly "available to" it.

But even if a separate requirement, I fail to see how the ACE policies are "[un]available to" Amway. By purchasing the ACE policies, Amway assured the State of Michigan that it could satisfy any "personal and advertising injury" judgments against it. R.235-3, ACE Policy at 6; *see White v. Ins. Co. of Pa.*, 405 F.3d 455, 457 (6th Cir. 2005) (describing how "fronting" policies can allow a business to "compl[y] with the financial-responsibility laws of each state in which the business is required to maintain proof of financial responsibility" (internal quotation marks omitted)). And now Amway can undisputedly use the policies to satisfy the judgments against it in the internet video litigation.

So my review of the text leads me to believe that the Michigan Supreme Court would hold that the ACE policies are "other valid and collectible insurance available to" Amway.  R.71-7, American Policy at 19, PageID 3027.

**B.**

I next turn to Michigan cases to see if they alter the plain meaning of the policy's text.

First, the majority opinion relies on a single Michigan case: *Auto-Owners Ins. Co. v. Leefers*, 512 N.W.2d 324 (Mich. Ct. App. 1993).  The majority invokes *Leefers* to narrow the plain meaning of "available" in the context of the "Other Insurance" clause.[3]  Maj. Op. at 13.  The *Leefers* court found that the term "available" in a policy exclusion "meant 'actually available' or 'accessible,' or that which is reasonably available, as opposed to that which is theoretically or hypothetically available."  512 N.W.2d at 326.  Applying this language to the ACE policies here, the majority opinion reasons that the policies at "best present hypothetical availability" because "Amway cannot collect insurance proceeds from ACE."  Maj. Op. at 13.  But the record belies any claim that the ACE policies were only "hypothetically available," since ACE itself has admitted coverage.  R.235-11.  So *Leefers* is not dispositive, because the ACE policy is "actually," rather than "hypothetically," available.

---

[3] The majority also invokes *Leefers* to suggest that Michigan's rule of construing ambiguity in favor of the insured applies, assuming without explanation that "the term 'available' is ambiguous."  Maj. Op. at 13 (quoting *Auto-Owners Ins. Co. v. Leefers*, 512 N.W.2d 324, 326–27 (Mich. Ct. App. 1993)).  I disagree because the "Other Insurance" clause itself is *not* ambiguous. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) at 32 ("A word or phrase is ambiguous when the question is which of two or more meanings apply; it is vague when its unquestionable meaning has uncertain application to various factual situations."); *Kentucky v. Yellen*, 54 F.4th 325, 346 (6th Cir. 2022) ("Ambiguity refers to situations in which language has at least two definite meanings and a court must select between or among them.").  We are not deciding between multiple possible meanings but determining whether a provision of "unquestionable meaning" reaches a particular scenario.  So Michigan's construction rule for ambiguity does not apply.

Other Michigan cases are more instructive: *Allstate Ins. Co. v. Elassal*, 512 N.W.2d 856 (Mich. Ct. App. 1994) and *Jarrad v. Integon Nat'l Ins. Co.*, 696 N.W.2d 621 (Mich. 2005). The majority opinion notes that both cases dealt with Michigan's no-fault automobile insurance system. Maj. Op. at 14.[4] But while I recognize that both cases arose from a different legal background, I find them helpful guides to how Michigan courts would apply the "Other Insurance" clause before us.

The *Elassal* court found that self-insured certification under Michigan law was "other collectible insurance" under a similar clause, although one dealing with automobile insurance. *Elassal*, 512 N.W.2d at 859. But *Elassal*'s reasoning applies more generally. The court concluded that "self-insurance is the functional equivalent of insurance," even with no "contract between two parties for indemnification," because the self-insured party "had indemnified itself to satisfy judgment against it." *Id.* This logic suggests that the Michigan courts would similarly view ACE's fronting policies as "valid and collectible insurance," since they enabled Amway to indemnify itself to satisfy any judgments against it—even if Amway itself ultimately shoulders the cost.

Turning to *Jarrad*, the Michigan Supreme Court cited *Elassal* favorably as a case that "recognized that self-insurance, as certified by the Secretary of State, is the functional equivalent of a commercial no-fault insurance policy." *Jarrad*, 696 N.W.2d at 627. To be sure, the *Jarrad* court noted that it did "not suggest that the holding in *Elassal* is directly relevant," since the case did not involve self-insurance. *Id.* at 627–28. And the court's holding relied on the No-Fault Act's use of the broader term "coverage" rather than "insurance." *Id.* at 626, 628–30. Even so, *Jarrad*

---

[4] I note that *Leefers*—on which the majority does rely—also arose out of Michigan's automobile insurance system. 512 N.W.2d at 325.

endorsed *Elassal*'s logic, suggesting that the Michigan Supreme Court would consider fronting policies such as ACE's "the functional equivalent" of regular insurance policies. *Id.* at 627.

My review of applicable Michigan cases confirms my reading of the policy's text: that the ACE policies trigger the American policy's "Other Insurance" clause.

## C.

Finally, let's consider decisions by our sister circuits—at most, persuasive authority.

The majority relies on *Scottsdale Ins. Co. v. United Rentals (N. Am.), Inc.*, 977 F.3d 69 (1st Cir. 2020). Maj. Op. at 14. The *Scottsdale* court held that similar ACE fronting policies were not "other insurance," because "in any scenario under which ACE would pay out under the policy, [the insured] would still be obligated to pay ACE back for any money spent." *Scottsdale Ins. Co.*, 977 F.3d at 75. Of course, the case dealt with Massachusetts, rather than Michigan, law. *Id.* at 74. But even if Michigan law were a blank slate, *Scottsdale*'s reasoning is flawed. The court suggested that insurance requires "risk shifting" from one party to another—and found none because the insured would "be obligated to pay ACE back for any money spent." *Id.* at 75. But fronting policies do involve at least some "risk shifting." After all, as the First Circuit itself recognized, the insurer runs the risk it will bear the costs of defense if the insured proves unable to pay its deductible. *Id.* ("ACE does have some responsibility below the $2M policy limit—specifically in the case when [the insured] cannot pay its deductible.").

I am more persuaded by *Air Liquide Am. Corp. v. Cont'l Cas. Co.*, 217 F.3d 1272 (10th Cir. 2000).[5] The *Air Liquide* court found that a similar "fronting" policy was "other collectible

---

[5] The majority opinion dismisses *Air Liquide* because the "Other Insurance" clause there was slightly different—specifically, it did not specify that the "other valid and collectible insurance" must be "available to [the insured]." Maj. Op. at 14–15. As explained above, I find this distinction unpersuasive.

insurance" under Oklahoma law—even though it was "actually a form of self-insurance." *Id.* at 1274, 1280. The court reasoned that otherwise "Air Liquide would receive the double windfall of avoiding significant premium payments under a standard insurance policy and avoiding primary liability." *Id.* at 1279. Amway would similarly receive a "double windfall" if, by using ACE's fronting policies to certify that it had insurance, it could make lower premium payments but avoid the primary liability associated with using such insurance. I am confident that the Michigan Supreme Court, like the Tenth Circuit, "would not reach such an inequitable result." *Id.*

I am similarly persuaded by *Cont'l Cas. Co. v. Nat'l Union Fire Ins. Co.*, 812 F.3d 1147 (8th Cir. 2016).[6] To be sure, that case dealt with equitable contribution under Minnesota law, rather than an "Other Insurance" clause. *See id.* at 1149–50. But I find it relevant, since it found that an insurer providing a "fronting" policy was contractually bound to pay for defense costs in the first instance. *Id.* at 1150–51. In reaching this conclusion, the Eighth Circuit found that the bottom-line impact of the policy's "fronting" structure "immaterial," focusing instead on "[the insurer's] legal obligations to [the insured]." *Id.* at 1150 n.6. So *Continental Casualty* suggests that the Michigan Supreme Court, following the Eighth Circuit's logic, may treat the ACE policies' fronting structure as "immaterial" because ACE still has a "legal obligation" to reimburse Amway for the internet video litigation in the first place.

So my review of decisions by our sister circuits only reinforces my assessment that the Michigan Supreme Court will find that the ACE policies qualify under the American policy's "Other Insurance" clause.

---

[6] The majority ignores *Continental Casualty* for the same minor drafting difference that leads it to dismiss *Air Liquide*. Maj. Op. at 14–15. Once again, I believe that this is a distinction without a difference.

\*　　\*　　\*

Since I believe that the Michigan Supreme Court would find that the ACE "fronting" policies are "other valid and collectible insurance available to" Amway, I respectfully dissent from the majority's holding to the contrary.